USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 94-2000 UNITED STATES OF AMERICA, Appellee, v. HENRY LOMBARD, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Stahl and Lynch, Circuit Judges. ______________ ____________________ F. Mark Terison, Assistant United States Attorney, with whom Jay _______________ ___ P. McCloskey, United States Attorney, was on brief, for the United ____________ States. Jane E. Lee, by appointment of the court, for appellant. ___________ ____________________ December 15, 1995 ____________________ LYNCH, Circuit Judge. Henry Lombard, Jr. and LYNCH, Circuit Judge. ______________ Hubert Hartley were tried separately in the Maine Superior Court in 1992 on charges of murdering two men. Each was acquitted. Afterward, Lombard and Hartley were indicted as co-defendants in the federal district court in Maine on federal firearms and other charges arising out of the murders. Hartley pleaded guilty at mid-trial, but appellant Lombard entrusted his fate to the jury. He was convicted. At sentencing, under the Guidelines, the district court found by a preponderance of the evidence that Lombard had used his illegally possessed firearm to commit "another offense": the same murders of which he had been acquitted in the state court. The resulting Guidelines sentence was a mandatory term of life in prison, which Maine law would not _________ have required even had defendant been convicted of the murders. Lombard thus received a life sentence based on the federal court's finding that it was more likely than not that Lombard had committed the murders of which he had been acquitted. The sentencing judge was greatly troubled but felt as a matter of law that he had no authority to do otherwise under the Guidelines. Lombard appeals the mandatory life sentence and his convictions. We affirm the convictions for the reasons stated later. We address first the very troubling sentencing issue. Finding that this is a case in which the life -2- 2 sentence enhancement is the "tail which wags the dog" of defendant's trial and conviction, thus raising constitutional due process concerns, we hold that under section 5K2.0 of the Guidelines the district court had the authority, which it thought it had not, to consider a downward departure. We vacate the life sentence and remand for a determination of whether a downward departure might be warranted in the unique circumstances here. I Background __________ On Thanksgiving morning of 1990, Morris Martin and Paul Lindsey, Jr. were murdered, each shot in the head as he lay sleeping in the living room of a small cabin in the backwoods of Fairfield, Maine. The cabin was owned by Hubert Hartley, the half-brother of the defendant Henry Lombard. All four men had been living in the cabin for a week to hunt deer in the surrounding woods. Tammy Theriault, Hartley's girlfriend, had also been living in the cabin, along with her eighteen month old daughter. She was also pregnant with Hartley's child at the time. Theriault was a near-eyewitness to the murders, able to hear and observe much through a hole in the floor of her upstairs bedroom. Lombard and Hartley were tried separately on state charges of murder before two juries in the Maine Superior Court. Each defendant testified in his own defense and -3- 3 claimed that the other had committed the murders. Hartley and Theriault testified against Lombard at Lombard's trial. Both state trials resulted in acquittals. One year later, a federal grand jury returned an indictment in the U.S. District Court, charging Hartley and Lombard with unlawful possession of a firearm, aiding and abetting the same, and with conspiracy charges relating to the aftermath of the murders.1 Lombard and Hartley were tried jointly in the federal district court. The prosecution's key witness was Tammy Theriault. Her testimony departed in some respects from the testimony and statements she gave earlier. She testified, as follows, that although she did not see the murders being committed, she did hear conversations between Hartley and Lombard just before and after the gunshots were fired. At about 10 a.m. on Thanksgiving morning, Lombard and Hartley returned to the cabin from a morning hunt. Martin and Lindsey were asleep on  ____________________ 1. Count 1 of the indictment charged Hartley and Lombard with a multi-part conspiracy with the following objectives: unlawfully to possess and aid and abet the unlawful possession of a firearm and ammunition in violation of 18 U.S.C. 922(g)(1); to cross state lines with intent to avoid prosecution or avoid giving testimony in a criminal proceeding in violation of 18 U.S.C. 1073; and to remove and transport from Hartley's cabin certain evidence of Lombard's unlawful possession of a firearm and ammunition, in violation of 18 U.S.C. 2232(a). Count 2 charged Lombard with unlawful possession of a firearm in violation of 18 U.S.C. 922(g), 924(e). Count 3 charged Hartley with aiding and abetting Lombard in the unlawful possession of a firearm, in violation of 18 U.S.C. 922(g)(1)-(2). -4- 4 couches in the living room. Hartley, seeing Theriault, told her to go back upstairs because he and Lombard "had something to do." On returning to her room, she heard Lombard say to Hartley, "[I]f you don't shoot him, I'm going to shoot 'em both." Next, Theriault, still upstairs with her baby daughter, heard five or six gunshots, followed by Lombard's exclamation, "I didn't think you had the guts to do it." Hartley boasted, "I showed you, didn't I?" and added, "I don't think he's dead yet. Shoot him again." Lombard and Hartley stuffed the victims' bodies in garbage bags, as Theriault watched through the hole in her bedroom floor. Theriault was with Lombard and Hartley as they cleaned the cabin of blood and other evidence, and hid the bodies temporarily in the cellar. The next day, as the two men were attempting to move the bodies to the trunk of Hartley's car, Theriault's family arrived to bring Thanksgiving leftovers. They sat visiting in the living room, with one victim's body hidden in the trunk of Hartley's car outside, the other still in the cellar. Theriault accompanied Lombard and Hartley when they later went to dump both bodies in a roadside bog. She was also present when Lombard sold his Marlin .22 caliber rifle as well as the victims' two hunting guns to a broker. Lombard and Hartley were planning to flee from Maine to Massachusetts just before they were arrested. -5- 5 Excerpts of testimony that Hartley and Lombard had given in their state court murder trials were also admitted into evidence. These excerpts (including Lombard's own prior testimony) corroborated much of Theriault's account and established that Lombard owned a Marlin .22 caliber rifle which he had brought to Hartley's cabin, that he loaded it on the morning of Thanksgiving Day, 1990, that he took the gun with him to go hunting that morning, and that Lombard and Hartley together attempted to clean the bloody cabin following the murders, removed evidence of the murders, disposed of the bodies, and planned to flee from Maine. Other witnesses' testimony established that Lombard had reason to be aware that he could not lawfully possess a firearm, that he nonetheless purchased the .22 caliber rifle from Tammy Theriault's brother, and that the bullets that were recovered from the victims' bodies were consistent with having been fired from a .22 caliber rifle.  Hartley pleaded guilty at the close of the government's case. Lombard, however, put his case to the jury (without presenting an affirmative case) and was convicted on both Counts 1 and 2 of the indictment. At Lombard's sentencing, the court applied a cross- reference in the relevant provision of the Guidelines governing the firearms conviction (Count 2), which essentially provided that if Lombard's unlawfully possessed -6- 6 firearm had been used in the commission of a murder, his base offense level (BOL) on that conviction was to be determined by the same guideline applicable to a conviction for murder. The court determined that the firearm had so been used. The resulting BOL required a term of life imprisonment, and Lombard was sentenced accordingly. II The Sentence ____________ Lombard raises two challenges to the sentence imposed by the district court. He contends that the life sentence was imposed in violation of his rights under the Due Process Clause.2 He also argues, to no avail, that he was  ____________________ 2. As a preliminary matter, we reject the government's assertion that the defendant did not properly preserve this issue for appeal. The issue of whether and in what way the murders of which Lombard had been acquitted could properly be considered at sentencing was adequately presented to and squarely addressed by the district court. As the court itself stated: The key issue in this sentencing, of course, is whether or not premeditated murder is the object offense in connection with which the firearms were unlawfully possessed. . . . Resolution of this issue is particularly difficult because of the fact that both defendants, Mr. Lombard and Mr. Hartley, were acquitted of first degree murder charges in the state court . . . . The suggestion made by counsel for Mr. Lombard quite appropriately is how could the object offense in deriving the calculation of the appropriate guideline in determining the sentence in this case be calculated on the basis of crimes for which the defendant has been acquitted albeit in state court? And that's the central core issue that has been troubling me throughout this process since the -7- 7 erroneously denied credit under the Guidelines for his acceptance ofresponsibility forthe firearms andflight crimes. A. Calculation of the Guidelines Sentence ______________________________________ Lombard received a life sentence as a thrice-prior convicted felon ostensibly for his unlawful possession of a firearm in violation of 18 U.S.C. 922(g) and 924(e).3 He was sentenced to the statutory maximum of 60 months for the conviction on the conspiracy count, concurrent with the life sentence.4 Lombard does not contend here that the district ___ court incorrectly applied the Guidelines in determining his life sentence, but rather argues that the manner in which the  ____________________ trial and during the presentence conferences and reviewing the presentence report and the transcripts. 3. Section 922(g)(1) provides: "It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce [paragraph structure omitted]." Section 924(e)(1) provides: "In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined not more than $25,000 and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g)." 4. Lombard has not appealed the sentence on the conspiracy conviction. -8- 8 Guidelines, as applied by the court, required it to conduct its factfinding and mandated the life sentence violated his constitutional rights. The specific guideline applicable to the defendant's firearms conviction is U.S.S.G. 2K2.1.5 Subsection (a)(2) of the 1990 version of section 2K2.1 sets a BOL of 12 "if the defendant is convicted under 18 U.S.C. 922(g) . . . ."6 The "cross-reference" provision of subsection (c)(2) of section 2K2.1 directs that "[i]f the defendant used or possessed the firearm in connection with commission or attempted commission of another offense, apply 2X1.1 . . . in respect to that other offense, if the resulting offense level is greater than that determined above." U.S.S.G. 2K2.1(c)(2) (Nov. 1990). Treating the murders as "another offense," and finding by a preponderance  ____________________ 5. Although the November 1993 version of the Guidelines was in effect at the time of Lombard's sentencing, the district court applied the 1990 version, apparently to avoid any ex __ post facto concerns. See United States v. Aymelek, 926 F.2d ____ _____ ___ _____________ _______ 64, 66 n.1 (1st Cir. 1991). The outcome (a mandatory life sentence) would not have been different had any later version of the Guidelines been applied. All citations to the Guidelines are to the 1990 version, unless otherwise noted. 6. An unadjusted BOL of 12 (given defendant's criminal history category of VI) would have translated into a sentence of 30-37 months. However, because defendant was sentenced as an armed career criminal under 18 U.S.C. 924(e), which provides for a 15-year minimum, his total offense level could not have been any lower than 34, even apart from consideration of the murders. See U.S.S.G. 4B1.4(b)(3)(A). ___ That offense level would have translated into a Guidelines sentencing range of 262-327 months. -9- 9 of the evidence that the defendant had committed that other offense, the court applied section 2X1.1, which directed the defendant's BOL to be set at "[t]he base offense level from the guideline for the object offense . . . ." U.S.S.G. 2X1.1(a) (Nov. 1990). The "object offense" was first degree murder, to which a BOL of 43 attaches.7 See U.S.S.G. ___ 2A1.1. Finding no basis for awarding acceptance-of- responsibility credit, the district court assigned a total offense level of 43. Because Lombard was sentenced as a career criminal under 18 U.S.C. 924(e), there was a statutory minimum of 15 years, but no stated statutory maximum applicable; thus no reduction was indicated under U.S.S.G. 5G1.1(a) (which requires adjustment of a Guidelines sentence to comply with the statutory maximum for the offense of conviction). The defendant's final Guidelines  ____________________ 7. The same result would obtain under the current version of the Guidelines. The November 1991 amendment to section 2K2.1(c) created a specific provision for cases in which the underlying offense conduct is found to have resulted in death. See U.S.S.G. App. C, amend. 374. The cross- ___ reference, as amended, provides as follows: (1) If the defendant used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense, . . . apply . . . (B) if death resulted, the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that determined above. U.S.S.G. 2K2.1(c)(1)(B) (Nov. 1995). -10- 10 sentence was a mandatory term of life imprisonment. See ___ U.S.S.G. Ch. 5, Pt. A (assigning life sentence to BOL of 43 for all criminal history categories). B. The Life Sentence _________________ The mandatory imposition of a life sentence here raises questions of whether such a result was strictly intended by the Sentencing Guidelines and whether the method followed to produce that result comports with the Due Process Clause. Our focus is on the process by which the result was reached. Lombard makes no claim, nor could he, on the facts here that imposition of a life sentence on him (accompanied by due process) would itself be unconstitutional under the Eighth Amendment. Harmelin v. Michigan, 501 U.S. ________ ________ 957 (1991). The life sentence resulted from the convergence of several doctrines in sentencing law, each individually well accepted, and none of which individually is questionable here. But just as folk wisdom recognizes that the whole is often greater and different than simply the sum of its parts, these individual doctrines, each reflecting compromises in our criminal jurisprudence, in this extreme case threaten in combination to erode rights that the Constitution does not permit to be compromised. We take as given that once convicted, a defendant has no right under the Due Process Clause to have his sentencing determination be confined to facts proved beyond a -11- 11 reasonable doubt. McMillan v. Pennsylvania, 477 U.S. 79 ________ ____________ (1986); United States v. Gonzalez-Vazquez, 34 F.3d 19, 25 _____________ ________________ (1st Cir. 1994). A sentencing court's operative factfinding is generally subject only to a "preponderance of the evidence" standard. See United States v. LaCroix, 28 F.3d ___ ______________ _______ 223, 231 (1st Cir. 1994); United States v. Mocciola, 891 F.2d _____________ ________ 13, 17 (1st Cir. 1989); United States v. Wright, 873 F.2d _____________ ______ 437, 441 (1st Cir. 1989). But cf. United States v. Kikumura, ___ ___ _____________ ________ 918 F.2d 1084, 1102 (3d Cir. 1990) (holding that "clear and convincing" standard applies in certain limited circumstances). Nor is a sentencing court limited to considering only the conduct of which the defendant was formally charged or convicted. Even before the advent of the Guidelines, some sentencing courts took into account any information known to them, including uncharged relevant conduct. See, e.g., Nichols v. United States, 114 S. Ct. __________ _______ _____________ 1921, 1928 (1994); Williams v. New York, 337 U.S. 241, 246 ________ ________ (1949); United States v. Concepcion, 983 F.2d 369, 387-88 (2d _____________ __________ Cir. 1992), cert. denied, 114 S. Ct. 163 (1993). ____________ The Guidelines were not intended to discontinue the courts' historical practice of considering the relevant circumstances of the defendant's real conduct, whether those circumstances were specifically charged or not. See United ___ ______ States v. Jackson, 3 F.3d 506, 509 (1st Cir. 1993); Wright, ______ _______ ______ 873 F.2d at 441; see generally Stephen Breyer, The Federal _____________ ____________ -12- 12 Sentencing Guidelines and the Key Compromises Upon Which They _____________________________________________________________ Rest, 17 Hofstra L. Rev. 1, 8-12 (1988). As now-Justice ____ Breyer noted, the Guidelines evince a compromise between a pure "charge offense" system in which sentences are determined based solely upon conduct of which a defendant is convicted, and a "real offense" system, in which sentences are fashioned in view of all relevant mitigating and aggravating factors surrounding the defendant's conduct. See ___ id. A sentencing court may, therefore, consider relevant ___ conduct of the defendant for purposes of making Guidelines determinations, even if he has not been charged with and indeed, even if he has been acquitted of that conduct, so _________ long as the conduct can be proved by a preponderance of the evidence. See United States v. Carrozza, 4 F.3d 70, 80 (1st ___ _____________ ________ Cir. 1993) (reasoning that failure of proof beyond a reasonable doubt does not preclude proof by a preponderance of the evidence), cert. denied, 114 S. Ct. 1644 (1994); ____________ Jackson, 3 F.3d at 509; Mocciola, 891 F.2d at 17. Resolution _______ ________ of this case does not require the questioning of any of these general rules but does involve recognition that there may be limits to their application. Both the Supreme Court and this court have recognized that the Due Process Clause itself imposes limits on the application of these doctrines in extreme cases, and we must interpret the Guidelines in light of those -13- 13 constraints. This court recognized in United States v. _____________ Rivera, 994 F.2d 942 (1st Cir. 1993), that there is a range ______ of discretion left to the district courts even within the Linnaean categorizations of the Guidelines. We hold, under Rivera, that the district court did have discretion here, ______ which it thought it had not, to consider a downward departure from the life sentence. Accordingly, we remand. 1. The Tail That Wags the Dog __________________________ The Supreme Court decisions on sentencing, while generally endorsing rules that permit sentence enhancements to be based on conduct not proved to the same degree required to support a conviction, have not embraced the concept that those rules are free from constitutional constraints. On the contrary, the Court has cautioned against permitting a sentence enhancement to be the "tail which wags the dog of the substantive offense." McMillan, 477 U.S. at 88. ________ McMillan involved a challenge to a Pennsylvania ________ statute that imposed a mandatory minimum prison sentence of five years for a defendant found at sentencing by a preponderance of the evidence to have "visibly possessed a firearm" in connection with his offense of conviction. The Court held that the statute did not violate the Due Process Clause. See McMillan, 477 U.S. at 92. ("[W]e have ___ ________ consistently approved sentencing schemes that mandate consideration of facts related to the crime, . . . without -14- 14 suggesting that those facts must be proved beyond a reasonable doubt." (citation omitted)). The Court did, however, take pains to place limits upon its holding: [The challenged statute] operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm. [The statute] "ups the ante" for the defendant only by raising to five years the minimum sentence which may be imposed within the statutory plan. The statute gives no impression of having been tailored to permit the visible possession finding to be a tail which ______________ wags the dog of the substantive offense. _______________________________________ Id. at 88 (emphasis added). ___ Here, in contrast, the tail has wagged the dog. The consideration of the murders at Lombard's sentencing upstaged his conviction for firearms possession. The circumstances of this case that have combined to produce this effect raise grave constitutional concerns, although each doctrine considered separately might not provoke a second thought. Cf. United States v. Sepulveda, 15 F.3d 1161, 1195- ___ _____________ _________ 96 (1st Cir. 1993) (circumstances that individually might not warrant appellate relief "may in the aggregate have a more debilitating effect" and that a cumulation of circumstances "may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts"), cert. denied, 114 S. Ct. 2714 (1994). ____________ -15- 15 The effect here has been to permit the harshest penalty outside of capital punishment to be imposed not for conduct charged and convicted but for other conduct as to which there was, at sentencing, at best a shadow of the usual procedural protections such as the requirement of proof beyond a reasonable doubt. This other conduct murder was surely of the most serious sort, but exactly the sort as to which our jurisprudence normally requires the government to meet its full burden of proof. When put to that proof in state court, the government failed. The punishment imposed in view of this other conduct far outstripped in degree and kind the punishment Lombard would otherwise have received for the offense of conviction. There was no safety valve, or so thought the trial judge, to adjust the Guidelines sentence of life imprisonment to assure consideration of the penalty imposed in light of the process followed. And that, in turn, raises questions as to whether Lombard received, as to his sentence, the process that the Constitution says was due. While we discuss individual concerns, we stress that it is the interplay amongst these concerns which is of import, and none of these concerns should be examined in isolation. We start with the paramount seriousness of the ostensibly "enhancing" conduct at issue. A charge of murder represents the very archetype of conduct that "has historically been treated in the Anglo-American legal -16- 16 tradition as requiring proof beyond a reasonable doubt." McMillan, 477 U.S. at 90 (citation and quotation marks ________ omitted). Thus, a rule structure that bars conviction of a firearms charge except on proof beyond a reasonable doubt, but then permits imposition of a life sentence upon proof of a murder by a preponderance of the evidence attaches, in effect, the lesser procedural protections to the issue that would naturally be viewed as having the greater significance. That anomaly is heightened by the specific manner in which the Guidelines operated here. Unlike certain "relevant conduct" guidelines that simply call for a determinate increase in a defendant's BOL based on specified factual findings, see, e.g., U.S.S.G. 2D1.1(b)(1) (calling _________ for two-level increase in BOL for drug conviction upon a finding that a firearm was possessed), the cross-reference provision that was applied in this case, U.S.S.G. 2K2.1(c), required the district court to calculate Lombard's BOL as if _____ his offense of conviction had been murder. See U.S.S.G. ___ 2K2.1(c), 2X1.1 (Nov. 1990).8 Particularly in light of the absence of any stated _____________________ statutory maximum for the firearms offense, see 18 U.S.C. __________________ ___ 924(e), the cross-reference to the first-degree murder  ____________________ 8. The current version of the cross-reference is even more explicit, directing the court to apply, in cases where death resulted from the defendant's offense conduct, "the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide)." U.S.S.G. 2K2.1(c)(1)(B) (Nov. 1995). -17- 17 guideline essentially displaced the lower Guidelines range _________ that otherwise would have applied. As a result, the sentence to be imposed for Lombard's firearms conviction was the same as the sentence that would have been imposed for a federal murder conviction: a mandatory term of life. Despite the nominal characterization of the murders as conduct that was considered in "enhancing" or "adjusting" Lombard's firearms conviction, the reality is that the murders were treated as the gravamen of the offense. As the enhancing conduct in this case was serious, so too was the "enhancement." Attribution of the murders to Lombard operated not merely to ratchet up his prison term by some fractional increment, but rather wholly to remove the defendant's sentence from the term-of-years continuum and transform it into a life sentence without the prospect of parole. That punishment represents "the second most severe penalty known to the law," Harmelin, 501 U.S. 957, 996 (1991) ________ (Scalia, J.). It qualitatively differs from any lesser sentence in resting upon a determination that the "criminal conduct is so atrocious that society's interest in deterrence and retribution wholly outweighs any considerations of reform or rehabilitation of the perpetrator." Id. at 2719 (Stevens, ___ J., dissenting) (citation and quotation marks omitted); see ___ also Helm v. Solem, 684 F.2d 582, 585 (8th Cir. 1982) ("A ____ ____ _____ life sentence without parole differs qualitatively from a -18- 18 sentence for a term of years" because it represents the "total[] reject[ion] of rehabilitation as a basic goal of our criminal justice system."), aff'd, 463 U.S. 277 (1983). In _____ short, the enhancement at issue not only increased the duration of Lombard's sentence, but placed his punishment on an entirely different order of severity. This qualitative difference between the life sentence imposed and the term of years that Lombard might otherwise have received as a prior offender (262-327 months) implicates basic concerns of proportionality both between the enhancement and base sentence and between the offense and punishment as a whole. Even if these concerns, considered alone, might not rise fully to the level of constitutional significance, they further distinguish this case from less troubling ones. The comparative severity of the enhancement invites scrutiny of the weight given to factfinding as to ostensibly "enhancing" conduct (the murders) allocated to the sentencing phase, with its looser procedural constraints and lesser burden of proof. It raises the danger of the defendant's trial and conviction being turned into a means of achieving an end that could not be achieved directly: the imposition of a life sentence "enhancement" based on a federally unprosecutable murder. In its interaction with the other concerns we describe, there is also an issue as to the proportion between the gravity of Lombard's offense of -19- 19 conviction and the severity of his punishment. If a life sentence without parole is appropriate for murder, in most instances that sentence might appear to be harsh punishment for the unlawful possession of a rifle, even by a career criminal. While one may doubt whether there are Eighth Amendment concerns9 lurking here, cf. Harmelin, 501 U.S. at ___ ________ 997-1001 (Opinion of Kennedy, J.), the harshness of the life sentence in relation to the offense of conviction highlights the need for rigorous inquiry.10 Without impugning the principle that acquitted conduct may be considered in determining a defendant's sentence, the prior state court acquittal presents another concern in its interaction here. Lombard put the Maine government to its proof on the charges of murder against him, and a state court jury determined that reasonable doubt as to his guilt persisted. The federal prosecution followed on the heels of the acquittal. As the particular murders at issue  ____________________ 9. Interestingly, the Constitution of the State of Maine contains an explicit proportionality guarantee: "[A]ll penalties and punishments shall be proportional to the offence." Me. Const. art. I, 9. Thus, it is a fair question whether the Maine Constitution would have permitted the resulting sentence here if Maine had done what the federal prosecution did. 10. It bears emphasis that the perceived severity of a sentence is not, standing alone, a basis for departing from the Guidelines sentencing range. United States v. Jackson, ______________ _______ 30 F.3d 199, 203-04 (1st Cir. 1994). Here, the magnitude of the sentence enhancement is of concern only when viewed in its interaction with the other aspects of this case. -20- 20 were outside the sphere of the federal prosecutor's criminal charging power as to murder,11 Lombard was not charged with murder in the federal indictment; the murders themselves were not alleged by the government to be an object of the defendants' conspiracy; and the federal jury was required to make no factual determination regarding the commission of the murders. Yet it would ignore reality not to recognize that the federal prosecution arose out of and was driven by the murders, and that the prosecution was well aware that the Sentencing Guidelines would require consideration of the murders at sentencing. This reality was reflected in the prosecution's statement at the pre-sentencing conference that "it was quite clear from the beginning; Mr. Lombard was looking at a life sentence." The government, by its own  ____________________ 11. The government conceded at oral argument that Lombard and Hartley could not have been charged under any of the federal murder statutes. See, e.g., 18 U.S.C. 1111, __________ 2113(e), 2118(c)(2); 21 U.S.C. 848(e). The murders did not take place on any federal installation, were not in connection with the robbery of a federally insured bank or a robbery involving federally controlled substances, nor were committed in the course of a continuing criminal enterprise as defined by federal law. Whether or not it could do so, the fact is that Congress has chosen not to federalize the state crime of murder in cases like Lombard's, and so has not authorized reprosecution for murder pursuant to the doctrine of separate sovereignties. See Abbate v. United States, 359 ___ ______ _____________ U.S. 187 (1959). Thus, the issue raised is not one of Double Jeopardy, nor, strictly speaking, of the reach of the federal power, but one of Due Process: whether the sentencing court is precluded from considering that the Sentencing Guidelines as applied, through the vehicle of sentence enhancement, effectively punishes the defendant for conduct as to which there exists no statutory authorization for the government even to prosecute. -21- 21 words, had intended "from the beginning" that consideration of the murders would result in a life sentence. Through the post-trial adjudication of the murders under a lesser standard of proof, the federal prosecution obtained precisely the result that the Maine state prosecutors attempted, but failed, to obtain. The federal prosecution may well have done better. The net effect of the Guidelines attribution of the murders to Lombard as understood by the district court was to mandate imposition of _______ a life sentence. This was the maximum that Lombard could _______ have received had he been convicted of murder in the Maine state court. See Me. Rev. Stat. Ann. tit. 17-A, 1251 ___ (setting minimum sentence of 25 years and maximum of life). Indeed, a state murder conviction might have yielded something less severe than a life sentence. See State v. St. ___ _____ ___ Pierre, 584 A.2d 618, 621-22 (Me. 1990) (vacating life ______ sentence and reducing sentence to term of 45 years, where although defendant "committed a brutal murder," the record failed to "establish behavior at the outermost portion of the range of cruelty that would constitute the aggravating circumstances of extreme cruelty").12 In any event, in no __  ____________________ 12. If Lombard had been convicted of murder in the Maine state court and received a sentence of a term of years, he would have been eligible to receive credit against time to be served under the "good time" provisions of state law, which are considerably more generous than similar federal provisions. Compare Me. Rev. Stat. Ann. tit. 17-A, 1253(3) _______ (entitling any person sentenced to a term of more than six -22- 22 circumstances under Maine law would Lombard have been subject _____________ to a mandatory life sentence. See State v. Shortsleeves, 580 _________ ___ _____ ____________ A.2d 145, 149-50 (Me. 1990); St. Pierre, 584 A.2d at 621. __________ Although Lombard's firearms offense was the vehicle by which he was brought into the federal criminal justice system, the life sentence resulted from the district court's finding that the defendant had committed murder. Characterized in other terms, through the mechanisms of the Guidelines and accompanying legal doctrines, the sentencing phase of the defendant's trial produced the conclusion he had committed murder and mandated imposition of a life sentence, but without the protections which normally attend the criminal process, such as the requirement of proof beyond a reasonable doubt. Given the magnitude of the sentence "enhancement," the seriousness of the "enhancing" conduct in relation to the offense of conviction, and the seemingly mandatory imposition of the life sentence, this summary process effectively overshadowed the firearms possession charge and raises serious questions as to the proper allocation of the procedural protections attendant to trial versus sentencing. See United States v. Gigante, 39 F.3d 42, ___ _____________ _______  ____________________ months "to receive a deduction of 10 days each month for observing all rules of the department and institution") with ____ 18 U.S.C. 3624(b) (permitting up to 54 days of good time credit per year to prisoners serving terms of more than one year but less than life but allowing no such credit to persons serving a sentence for a crime of violence). -23- 23 47 (2d Cir. 1994) ("[W]e agree that there is a constitutional requirement of some rough proportionality between the weight of the evidence of the uncharged conduct and the degree of [the sentencing] adjustment . . . ."). We would be hard put to think of a better example of a case in which a sentence "enhancement" might be described as a "tail which wags the dog" of the defendant's offense of conviction. McMillan, 477 ________ U.S. at 88. The convergence of circumstances and processes that yielded Lombard's life sentence distinguishes this case from United States v. Mocciola, 891 F.2d 13, 17 (1st Cir. 1989), _____________ ________ and its progeny. Mocciola itself involved the attribution to ________ the defendant of an acquitted firearms offense pursuant to U.S.S.G. 2D1.1(b)(1)13 and rejected the contention that consideration of the acquitted conduct (under a preponderance of the evidence standard) was unconstitutional. Id. (quoting ___ McMillan, 477 U.S. at 91, and Wright, 873 F.2d at 441). The ________ ______ acquitted conduct considered in Mocciola, a firearms offense, ________ was well within the sphere of ordinary federal prosecution. The consideration of the acquitted conduct in Mocciola had a ________  ____________________ 13. The defendant had pleaded guilty on a cocaine conspiracy charge, but went to trial and was acquitted by the federal jury on a firearms possession charge arising out of the same course of conduct. See Mocciola, 891 F.2d at 14. ___ ________ -24- 24 relatively limited effect, simply increasing the sentence by two offense levels (15 months). See id. at 15, 17.14 ___ ___ In United States v. Carrozza, 4 F.3d 70 (1st Cir. _____________ ________ 1993), cert. denied, 114 S. Ct. 1644 (1994), defendant _____________ Patriarca's appeal raised the question whether "relevant conduct" under U.S.S.G. 1B1.3 could include two murders of which Patriarca himself had not been charged, but which had been committed in furtherance of the conspiracy to which he had pleaded guilty. This court answered in the affirmative, reversing the district judge's conclusion. See id. at 80-81. ___ ___ Carrozza supports the analysis here in several ________ important respects. Although defendant Patriarca himself had not been charged federally with murder, at least one of his confederates had pleaded guilty to such a charge in a related  ____________________ 14. At least two post-Mocciola cases from this circuit were ________ likewise decided on facts dissimilar to the circumstances here. See United States v. Gonzalez-Vazquez, 34 F.3d 19, 23- ___ _____________ ________________ 26 (1st Cir. 1994) (upholding, after drug conviction, two- level sentence enhancement under U.S.S.G. 2D1.1(b)(1) in view of conduct alleged in a dismissed firearms charge); United States v. Jackson, 3 F.3d 506, 509-10 (1st Cir. 1993) ______________ _______ (same, in view of uncharged conduct of which co-defendant was acquitted). Also, in United States v. LaCroix, 28 F.3d 223 (1st _____________ _______ Cir. 1994), the holding of Mocciola was restated in dictum, ________ but the only issue was whether certain financial losses could be attributed to the defendant under the "relevant conduct" provision of U.S.S.G. 1B1.3(a)(1) (June 1988). The defendant had been convicted as a participant in the conspiracy that caused those losses, but the jury had deadlocked on the substantive counts. The jury's inability to reach consensus on the substantive counts was held not to preclude a finding that the losses were foreseeable to the defendant as a convicted co-conspirator. See id. at 230-31. ___ ___ LaCroix does not aid the resolution of this case. _______ -25- 25 case. See United States v. Patriarca, 807 F. Supp. 165, 185 ___ _____________ _________ (D. Mass. 1992), vacated, Carrozza, 4 F.3d 70. Certainly, _______ ________ there had been no acquittal. Even more importantly, Carrozza's holding was based on the explicit assumption that ________ consideration of the murders would not necessarily result in ___ a life sentence. In fact, the district court had refused to consider the uncharged murders in sentencing Patriarca, troubled by the prospect of exposing the defendant to a life sentence on the basis of uncharged conduct. This court rejected the premise of the district court's concern, _______ explaining that Patriarca's offenses of conviction RICO violations carried statutory maximum sentences of twenty _______ ______ years each. See Carrozza, 4 F.3d at 81. But even so, the _____ ___ ________ panel was careful to reserve decision as to whether there might remain a basis for concern if the district court were to order Patriarca to serve consecutive twenty-year sentences ___________ on each of his three RICO convictions, the practical equivalent of a life sentence. The court openly acknowledged that it was troubled by this potentiality: At least one member of the panel believes that serious constitutional concerns may arise if the defendant ultimately receives the equivalent of a life sentence on the ground of his connection with a murder for which he was never indicted, tried or convicted by a jury. See id. at 81 n.9. ___ ___ -26- 26 The situation hypothesized in Carrozza is closer to ________ the one we face here, with added amplifying elements. Lombard was acquitted of the murders by a state court jury. _________ Nonetheless he received not just "the equivalent of a life sentence" based on attribution of the murders, but a true life sentence, and a mandatory one at that. Further, the sentence imposed may have been even more severe than what he would have received had he been convicted in state court. We believe, as did "at least one member of the panel" in Carrozza, that the life sentence imposed upon the defendant ________ raises "serious constitutional concerns." Id. ___ These concerns are reinforced by the Supreme Court's recent discussion in Witte v. United States, 115 S. _____ ______________ Ct. 2199 (1995). The Court framed its analysis by asking when a sentence enhancement can properly be viewed as punishment for the offense of conviction, as opposed to ___ punishment for the enhancing conduct. While the case ___ involved a Double Jeopardy and not a Due Process challenge, its discussion is instructive here: if the life sentence that Lombard received can realistically be viewed as punishment for the murders, as opposed to punishment for the firearms ___ offense, the constitutional difficulties alluded to in McMillan then come to the fore. ________ In Witte, the defendant had been convicted on a _____ marijuana charge, then received an enhanced prison term in -27- 27 view of certain cocaine-related "relevant conduct" considered at sentencing. Later, the defendant was prosecuted for that same cocaine-related conduct. He objected on double jeopardy grounds, arguing that he had already been punished for the ___ cocaine-related conduct by virtue of the sentence enhancement following the marijuana conviction. The Supreme Court disagreed and held that the defendant had been punished in the first prosecution only for the offense of conviction (the ___ marijuana charge), even though the sentencing court had considered the cocaine-related conduct in calculating his sentence. See id. at 2207. In so concluding, however, the ___ ___ Court emphasized that the sentence for the defendant's offense of conviction (the marijuana charge) had carried a statutory maximum, and the "enhancement" to the defendant's sentence had merely fixed the term of imprisonment at some point closer to (but still below) that maximum: The relevant conduct provisions of the Sentencing Guidelines . . . are sentencing enhancement regimes evincing the judgment that a particular offense should receive a more serious sentence within the authorized range if it was _____________________________ either accompanied by or preceded by additional criminal activity. Petitioner __________ does not argue that the range fixed by _________________________________________ Congress is so broad, and the enhancing _________________________________________ role played by the relevant conduct so _________________________________________ significant, that consideration of that _________________________________________ conduct in sentencing has become "a tail _________________________________________ which wags the dog of the substantive _________________________________________ offense." McMillan, 477 U.S. at 88 ________ ________ . . . . We hold that, where the legislature has authorized such a particular punishment range for a given ___________________________ -28- 28 crime, the resulting sentence within that ___________ range constitutes punishment only for the _____ offense of conviction for purposes of the double jeopardy inquiry. Witte, 115 S. Ct. at 2208 (emphases added, some citations _____ omitted). This case presents precisely the troubling situation that Witte makes an effort to distinguish: the _____ applicable statutory sentencing range (fifteen years minimum, no stated maximum) is quite broad, and the enhancing role played by the relevant conduct the murders is inordinately significant. The effect of considering the murders was not just to fix Lombard's sentence at some higher ___ point within a particular range delimited by Congress for the firearms offense.15 Instead, the Guidelines, combined with  ____________________ 15. This is in striking contrast to the case of Lombard's co-defendant, Hartley. After he pleaded guilty, Count 3 of the indictment was dismissed as to him on the government's motion. Hartley's BOL of 12 as to Count 1, with a criminal history category of I, would have yielded a sentence of 10-16 months. The district court found that Hartley, like Lombard, was subject to the cross-reference provision of U.S.S.G. 2K2.1(c). But, as the government informed us at oral argument, Hartley who did not qualify as a career criminal had the benefit of a five-year statutory maximum on his _________ conviction under Count 1, see 18 U.S.C. 371, which is what ___ he received after his plea. (Had Count 3 not been dismissed, Hartley likely would have been subject to the ten-year ________ statutory maximum contained in 18 U.S.C. 924(a)(2) for aiding and abetting the firearms offense.) Thus, for Hartley, consideration of the murders under U.S.S.G. 2K2.1(c) only had the effect of increasing his sentence from a base of 10-16 months to the statutory maximum of five years, even though Tammy Theriault's testimony indicated that Hartley shared at least equal blame with Lombard for the _____ murders. -29- 29 the absence of a stated statutory maximum, essentially required the district court to determine Lombard's base offense level as if his offense of conviction had been first- _____ degree murder.16 See U.S.S.G. 2K2.1(c). This comes ___ perilously close, we believe, to punishing Lombard for the ___ ostensibly "enhancing" conduct, the murders.17  ____________________ 16. Cases from other circuits addressing the permissibility of considering acquitted (or uncharged) conduct at sentencing generally have involved only modest sentence increases, or increases that were within a stated statutory maximum, or both, and so provide little guidance here. See, e.g., United _________ ______ States v. Hunter, 19 F.3d 895, 896-97 (4th Cir. 1994) ______ ______ (affirming 2-level sentence enhancement on drug conviction based on an acquitted firearms charge); United States v. _____________ Smith, 5 F.3d 259, 261-62 (7th Cir. 1993) (affirming _____ imposition of statutory maximum sentence of 5 years for firearms conviction based on finding at sentencing that defendant had committed second degree murder, even though defendant had been convicted only of involuntary manslaughter in state court); United States v. Galloway, 976 F.2d 414, _____________ ________ 424-26 (8th Cir. 1992) (en banc, 7-5) (approving consideration of uncharged property theft to enhance sentencing range on conviction for interstate theft from 21- 27 months to 63-78 months, where statutory maximum was 10 years), cert. denied, 113 S. Ct. 1420 (1993); United States ____________ _____________ v. Bronaugh, 895 F.2d 247, 250-52 (6th Cir. 1990) (affirming ________ increase of sentence for firearms conviction from range of 4- 27 months to statutory maximum of five years, based on uncharged drug trafficking offenses); United States v. ______________ Juarez-Ortega, 866 F.2d 747, 748-49 (5th Cir. 1989) (per _____________ curiam) (affirming increase of sentence for drug conviction, within statutory maximum, based on consideration of acquitted firearms charge). 17. The application of section 2K2.1(c) here might be viewed as being less like the sentencing statute approved of in McMillan and similar cases, and more like the scheme ________ invalidated in Specht v. Patterson, 386 U.S. 605, 607 (1967). ______ _________ In Specht, the Court held that where the defendant had been ______ convicted under a sex offender statute carrying a 10-year maximum penalty, the state could not constitutionally sentence him without a hearing (with appropriate protections such as the right to counsel and to cross-examine witnesses) -30- 30 In the aftermath of Witte, this court in United _____ ______ States v. Rivera-Gomez, 67 F.3d 993 (1st Cir. 1995), recently ______ ____________ noted that the manner in which a sentence is enhanced over and above the sentence that a defendant would otherwise receive is subject to constitutional limits: [T]he burgeoning use of sentence enhancers by Congress and the Sentencing Commission as part of the catechism of punishment poses an obvious danger that, in extreme circumstances, the lagniappe might begin to overwhelm the main course. In all probability, there are constitutional limits on the way sentencing factors can be deployed in the punishment of a substantive offense. Id. at 1001. ___ There is substantial reason for concern that the "enhancement" that produced Lombard's life sentence exceeded these limits. The convergence that produced Lombard's life sentence, we believe, is exactly the reason for the Supreme Court's reserve in McMillan and in Witte when it carefully ________ _____ withheld its constitutional blessing for a sentence "enhancement" that would be a "tail which wags the dog" of a defendant's offense of conviction. That troubling hypothetical is the reality here.  ____________________ under a separate but related statute that permitted imposition of a sentence of 1 day to life based on proof that the defendant posed a threat of bodily harm to the public. Cf. Galloway, 976 F.2d at 441-42 (en banc) (Bright, J., ___ ________ dissenting) (comparing operation of the relevant conduct provision of U.S.S.G. 1B1.3(a)(2) (Nov. 1991) to the scheme invalidated in Specht). ______ -31- 31 2. Considering Departure: Outside _______________________________ the "Heartland" ______________ Against this background, we look first to whether the Guidelines themselves are indeed so inflexible as the government urged at sentencing, or whether they permit a different result, and if so, whether that result would avoid the constitutional issue. See United States v. Monsanto, 491 ___ _____________ ________ U.S. 600, 611 (1989); Edward J. DeBartolo Corp. v. Florida __________________________ _______ Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 __________________________________________ (1988). We hold that a sentence of life imprisonment was not an inexorable outcome under the Guidelines, that this case is within the scope of section 5K2.0 which provides flexibility, and that, under our decision in Rivera, the district court ______ had authority to avoid any unfairness in Lombard's sentence through the mechanism of downward departure. The principles governing downward departures under the Sentencing Guidelines were comprehensively outlined by this court in United States v. Rivera, 994 F.2d 942 (1st Cir. _____________ ______ 1993), and we apply its teachings here. A fundamental premise of the Sentencing Guidelines is that "each guideline . . . carv[es] out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S.S.G. Ch. 1, Pt. A, intro. comment. (4)(b); see Rivera, ___ ______ 994 F.2d at 947. As the Sentencing Commission itself recognized, however, some cases will involve circumstances that make them atypical and remove them from the "heartland" -32- 32 of a guideline's literal scope. U.S.S.G. Ch. 1, Pt. A, intro. comment. (4)(b). A case that falls outside of a guideline's heartland "is, by definition, an 'unusual case'" and therefore a candidate for downward or upward departure. Rivera, 994 F.2d at 947. The basic question, then, is ______ simply: "Does this case fall within the 'heartland,' or is it an unusual case?" Id. at 948. ___ The Sentencing Commission has been explicit that, with several notable exceptions not applicable here, it "d[id] not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." U.S.S.G. Ch. 1, Pt. A, intro. comment. (4)(b). The Guidelines themselves recognize that even if a case presents no circumstances specifically identified as permissible grounds for departure, the case may still be sufficiently unusual to warrant it: Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The controlling decision as to whether and to what extent departure is warranted can only be made by the courts. . . . Any case may involve factors in addition to those identified that have not been given adequate consideration by the Commission. Presence of any such factor may warrant departure from the guidelines, under some circumstances, in the discretion of the sentencing court. -33- 33 U.S.S.G. 5K2.0. The commentary to section 5K2.0 further provides that even where various single circumstances, considered individually, might be insufficient to permit a finding that a case is outside the heartland of a particular guideline, the presence of those circumstances in combination might permit a different assessment: The Commission does not foreclose the possibility of an extraordinary case that, because of a combination of . . . characteristics or circumstances [that separately would not warrant departure], differs significantly from the "heartland" cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case. U.S.S.G. 5K2.0, comment. (Nov. 1995).18 The Guidelines, in short, do not always mandate the appropriate sentence. See Rivera, 994 F.2d at 949 ("Ultimately, . . . the ___ ______ Guidelines cannot dictate how courts should sentence in such special, unusual or other-than-ordinary circumstances."). Although the district court is entitled to considerable "leeway" in its determination of whether a given  ____________________ 18. Amendments to the Guidelines that are intended to clarify rather than change the Guidelines' operation, such as _______ the 1994 amendments to the commentary to section 5K2.0, may be applied retroactively. See United States v. Doe, 18 F.3d ___ _____________ ___ 41, 47 (1st Cir. 1994); see also LaCroix, 28 F.3d at 227 & _________ _______ n.4 (stating that clarifying amendments to the Guidelines "may be taken into account retrospectively, not only by the sentencing court . . . but also on appeal" (citations omitted)). -34- 34 set of circumstances renders a particular case "unusual," id. ___ at 951, this court has plenary review over legal questions involving interpretation of the Guidelines and over the district court's determination of whether it had authority to depart based on its assessment of the relevant sentencing facts. See id. at 951. ___ ___ Here, the district court did not consider whether departure would have been appropriate under U.S.S.G. 5K2.0. At Lombard's sentencing hearing, the district court expressed considerable unease at the sentence of mandatory life imprisonment that had resulted from its consideration, as required by the Guidelines, of Lombard's acquitted conduct.19 The government asserted at the sentencing hearing that the Guidelines "leave this court in essence no __ discretion whatsoever to sentence [Lombard] below life __________ __________ imprisonment [emphasis added]." The district court thought that it lacked authority to impose any sentence other than life imprisonment. The court also did not consider whether the constitutional questions raised by the mandatory life sentence might warrant a finding that this case falls outside the heartland of the applicable guideline. Thus, we conclude, as did the court in Rivera, that the district court ______  ____________________ 19. For example, the district court worried: "The problem is that th[is] scenario is very difficult for me to accept when the whole concept of our criminal justice system is based on innocent until proven guilty, and when there is an acquittal, there has been no proof of guilt." -35- 35 erroneously believed it had no power to deviate from the sentence indicated by a straightforward application of the Guidelines and "did not realize that it had the legal power to consider [downward] departure" in the special circumstances presented. See Rivera, 994 F.2d at 953. ___ ______ The facts and circumstances of this case present a whole greater than the sum of its parts and distinguish it, from a constitutional perspective, from other cases that have involved facially similar issues. The specific question from the perspective of the Guidelines and under U.S.S.G. 5K2.0 is whether these features of the case e.g., the state court ____ acquittal and the fact that the federal sentence may exceed any state sentence that would have attached to a murder conviction; the paramount seriousness of the "enhancing conduct"; the magnitude of the "enhancement"; the disproportionality between the sentence and the offense of conviction as well as between the enhancement and the base sentence; and the absence of a statutory maximum for the offense of conviction taken in combination, make this case "unusual" and remove it from the "heartland" of the guideline ( 2K2.1) that yielded the mandatory life sentence. This case is outside the "heartland." The Sentencing Commission in writing U.S.S.G. 2K2.1(c) was undoubtedly aware that the cross-reference provision might in some cases call for a defendant's base -36- 36 offense level to be determined by reference to the guideline governing murder. See U.S.S.G. 2K2.1(c)(1)(B) (Nov. 1995). ___ But from our "intermediate vantage point" in the sentencing process, we try to place particular cases within "a broader perspective of sentencing law," Rivera, 994 F.2d at 949. It ______ seems to us unlikely that the Commission could have envisioned the particular combination of circumstances that in this case culminated in the mandatory life sentence and the corresponding institutional concerns. Whether or not constitutional concerns were raised by these circumstances, as we think they are, we conclude that their combination here gave the court power to depart under U.S.S.G. 5K2.0. That the application of the Guidelines that produced the mandatory life sentence does raise constitutional concerns only reinforces our conclusion. This case may be viewed virtually by definition as an "unusual" one falling outside the heartland of section 2K2.1(c). To decide otherwise would be to assume that the Commission intended that the application of section 2K2.1(c)'s cross-reference provisions could, even in a heartland case, produce sentences raising serious _________ constitutional issues. This we cannot do. Cf. Burns v. ___ _____ United States, 501 U.S. 129, 137-38 (1991) (declining to ______________ credit an interpretation of Fed. R. Crim. P. 32 that would -37- 37 effectively impute to Congress an intent to produce a potentially unconstitutional result). One of the major goals of the sentencing reforms enacted by Congress was to "assure that sentences are fair both to the offender and to society." S. Rep. No. 225, 98th Cong., 2d Sess. 39 (1984), reprinted in 1984 U.S.C.C.A.N. ____________ 3182, 3222, quoted in United States v. LaBonte, __ F.3d __, _________ _____________ _______ __, No. 95-1538, slip op. at 24 (1st Cir. Dec. 6, 1995). That sense of fairness is better served here by giving effect to the discretion preserved to the courts by the Commission in U.S.S.G. 5K2.0. If a goal of the Guidelines is to "avoid[] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct," 28 U.S.C. 991(b)(1)(B), it is difficult to see how mandating imposition of a life sentence on the facts here serves that goal. It is the conduct for which there has been no conviction which raises the sentence here to a life term, and then only by means of a finding by a mere preponderance of the evidence. Yet a life term is the same sentence that would have been imposed for a conviction of murder. Giving unbridled effect here to the cross-referenced murder guideline would, instead of furthering the goal of treating like cases alike, ignore the very real differences inherent in our system of criminal justice between a conviction for murder based on proof beyond a reasonable -38- 38 doubt and a firearms conviction enhanced by a finding that guns were used to commit the same murder based on a preponderance of the evidence. Cf. Gigante, 39 F.3d at 47-48 ___ _______ (characterizing preponderance standard as a mere "tie- breaker" for evenly balanced evidence). Viewing this case as falling outside the heartland of section 2K2.1(c) seems more consistent with the sentencing goals set by Congress.20 See LaBonte, __ F.3d at __, slip. op. at 24. ___ _______ The Guidelines were not meant to have foreclosed the district court from considering a section 5K2.0 downward departure here. Cf. United States v. Cuevas-Gomez, 61 F.3d ___ _____________ ____________ 749, 750 (9th Cir. 1995) (noting that automatic 16-level sentence enhancement for certain defendants under U.S.S.G. 2L1.2(b)(2) averts due process problems "precisely because" the district court has discretion to consider departure based on the individual facts of the case). Certainly, a downward departure here would not be forbidden. See id.; Concepcion, ___ ___ __________ 983 F.2d at 389. Had such a downward departure been considered, the impact of giving sentencing weight to the acquitted murders could have been tempered by the district  ____________________ 20. Of course, where the text of an applicable guideline is clear, the sentencing court may not rely upon its own views about the purposes of sentencing nor upon a personal sense of inequity to deviate from the Guidelines sentencing range. See, e.g., United States v. Talladino, 38 F.3d 1255, 1265 _________ ______________ _________ (1st Cir. 1994). Here the sentencing policies articulated by Congress strengthen the analysis of why the unusual features of this case warrant consideration of a downward departure. -39- 39 court's fact-based, discretionary judgment. That judgment would have been informed by the background principle that a sentence enhancement may not function as a "tail which wags the dog" of the defendant's offense of conviction. The approach adopted here is similar to that adopted by the Second Circuit, which has used the mechanism of downward departure to resolve a situation similar to this one. In United States v. Concepcion, one of three ______________ __________ codefendants (Frias) was convicted on a firearms charge but acquitted of a drug conspiracy charge. On the firearms charges alone, the defendant's guidelines sentencing range would have been 12-18 months. Applying the cross-reference in U.S.S.G. 2K2.1 (the same provision at issue here), the district court had found that the defendant actually had engaged in the acquitted conduct, and thus determined his base offense level with reference to that conduct. The result was a 24-level upward adjustment, with a final Guidelines sentencing range of 210-262 months. 983 F.2d at 389. The Second Circuit, reviewing settled circuit precedent, held that the district court had properly applied the Guidelines, and that the defendants' constitutional rights had not been violated by the consideration of the acquitted conspiracy charge. Yet the court expressed serious discomfort with the magnitude of the sentence enhancement -40- 40 that had resulted. It observed: "we doubt that, with respect to conduct of which the defendant was acquitted, the [Sentencing] Commission intended so extreme an increase." Id.;21 see also United States v. Monk, 15 F.3d 25, 26, 28- ___ ________ _____________ ____ 29 (2d Cir. 1994). The court concluded that in the circumstances of that case, a downward departure under U.S.S.G. 5K2.0 might well have been warranted. Because "the [district] court apparently [had] not consider[ed] whether such a departure was permissible," the Second Circuit vacated the sentence and remanded for further proceedings. Id.22 ___  ____________________ 21. Concurring, Judge Newman expressed his own view more sharply: Under the rigor of the current Guidelines, the sentencing judge is required to assess evidence of relevant misconduct, notwithstanding an acquittal, and, if persuaded by a preponderance of the evidence that such misconduct occurred, must enhance the sentence according to the same scale of severity that would have applied had the defendant been convicted of the misconduct. . . . Thus, after [defendant] was tried for the conspiracy offense and acquitted, he faces virtually the same sentence that he would have received had he been convicted! . . . When the Guidelines and the case law implementing them permit such a result, it is high time for both the Commission and the courts to give serious reconsideration to the decisions that underlie this outcome. 983 F.2d at 395 (Newman, J., concurring) (paragraph structure omitted). 22. On remand, the district court determined that a downward departure was indeed appropriate and resentenced the defendant to a term of 144 months. This new sentence was affirmed. See United States v. Frias, 39 F.3d 391, 392 (2d ___ _____________ _____ -41- 41 On the facts here, we are not as confident, as was the Second Circuit in Concepcion, that the sentence __________ enhancement at issue passes constitutional muster. We do share the doubts of the Second Circuit that the Sentencing Commission could have foreseen the kinds of circumstances which in this case have coalesced to produce a mandatory life sentence, and we agree that in these circumstances, a downward departure under U.S.S.G. 5K2.0 was within the court's discretion. This case presents difficult and delicate issues, not now susceptible of articulation through general rules. Our concerns have arisen from a situation where acquitted conduct calling for the challenged sentence increase is itself very serious conduct, substantively more serious than the offense with which defendant was charged, where consideration of that conduct resulted in an enormous increase23 in the sentence (including possibly beyond the sentence that would have been imposed for a conviction), where the ultimate sentence is itself enormous, and where the  ____________________ Cir. 1994) (per curiam), cert. denied, 115 S. Ct. 1433 ____________ (1995). 23. Whether an increase in a sentence is enormous is a matter of degree, not resolved simply by the labels of ratios, percentages, or the like. For example, no one would deny the real difference between an increase of a sentence from one year to three years and an increase from 20 to 60 years, even though each represents an increase of 300 percent. -42- 42 judge is seemingly mandated to impose that sentence. Such a situation increases the risk that what the judge is required to and in fact is sentencing the defendant for is not the convicted offense as enhanced by relevant conduct, but directly for conduct as to which the defendant has not been charged, tried by a jury, nor convicted on proof beyond a reasonable doubt. See Rivera-Gomez, 67 F.3d at 1001. ___ ____________ The concerns which the district court expressed here are valid, and we have tried to state the reasons for those concerns, and forcefully so. But we also stress that this is an extreme case. Absent the special circumstances we have highlighted here, no comparable concerns would be raised by cases involving even sizeable sentence increases based on an uncharged quantity of drugs, see United States v. ___ ______________ Castellone, 985 F.2d 21, 24 (1st Cir. 1993), an uncharged or __________ acquitted firearms offense, see United States v. Gonzalez- ___ _____________ _________ Vazquez, 34 F.3d 19, 25 (1st Cir. 1994), the defendant's _______ commission of an unchargeable state offense, see United ___ ______ States v. Carroll, 3 F.3d 98 (4th Cir. 1993), or any number ______ _______ of kindred sentence enhancements. The outcome we adopt here should not be understood as an invitation to litigate constitutional or departure issues in usual cases involving sentence enhancements based on uncharged or acquitted conduct. This is an unusual and perhaps a singular case, at -43- 43 the boundaries of constitutional sentencing law, and does not provide an open door. Because the district court did not recognize its authority to consider whether a downward departure would have been appropriate, we vacate Lombard's life sentence and remand for further proceedings.24 See Rivera, 994 F.2d at ___ ______ 953; United States v. Castiello, 915 F.2d 1, 5-6 (1st Cir. _____________ _________ 1990) (remanding for resentencing where district court erroneously thought it had no power to depart from the guidelines sentencing range), cert. denied, 498 U.S. 1068 _____________ (1991); cf. United States v. Garafano, 61 F.3d 113, 116 (1st ___ _____________ ________ Cir. 1995) (appellate courts have broad power to "adapt mandates to the particular problem discerned on appeal"). C. Acceptance of Responsibility ____________________________ Lombard's claim that the district court erroneously refused to award him sentencing credit for acceptance of responsibility under U.S.S.G. 3E1.1(a) is without merit. Lombard has not met his burden of clearly demonstrating acceptance of responsibility for his offense. U.S.S.G. 3E1.1(a). Review of the adequacy of the defendant's proof is only for clear error. See United States v. Ocasio-Rivera, ___ _____________ _____________ 991 F.2d 1, 4 (1st Cir. 1993).  ____________________ 24. The government agreed at oral argument that if we were to find that the district court erroneously believed that it lacked authority to grant a downward departure, a remand for resentencing would be the proper remedy. -44- 44 Lombard appears to contend that prior incriminating statements made by him, e.g., his admissions at his state ____ trial that he owned the .22 caliber rifle and helped to clean up the cabin after the murders, demonstrate his "acceptance of responsibility." Hardly so. These statements were made to defend against state charges and cannot plausibly be taken as warranting a sentence reduction under section 3E1.1(a). The making of an incriminating statement cannot, without more, establish acceptance of responsibility. Cf. United ___ ______ States v. Wrenn, 66 F.3d 1, 2-3 (1st Cir. 1995) (divulging ______ _____ incriminating information to government informant did not establish eligibility for sentencing leniency under 18 U.S.C. 3553(f)). Application note 2 to section 3E1.1 specifically cautions that in most circumstances, the acceptance-of- responsibility credit "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. 3E1.1, comment. (n.2). Lombard has not even done that much: the record discloses not even a post-conviction admission of guilt or remorse with respect to the federal charges. III The Conviction ______________ -45- 45 Lombard claims that the district court committed a number of trial errors that affected the jury's verdict. Considering each claimed misstep in turn, we conclude that there was no reversible error. A. Admissibility of Hartley's Former Testimony ___________________________________________ Excerpts of Hartley's prior testimony from his own state murder trial and from Lombard's state trial were admitted into evidence. Lombard contends that Hartley's former testimony was inadmissible hearsay, and that its admission violated the Confrontation Clause. The trial court's evidentiary rulings are reviewed for an abuse of discretion. See United States v. Abreu, 952 ___ _____________ _____ F.2d 1458, 1467 (1st Cir.), cert. denied, 503 U.S. 994 _____________ (1992). Any properly preserved error of constitutional magnitude requires reversal unless shown to be harmless beyond a reasonable doubt. See Chapman v. California, 386 ___ _______ __________ U.S. 18 (1967). 1. Hartley's Prior Testimony from _______________________________ Lombard's State _____________________ Trial _____ Approximately 60 pages of Hartley's testimony from Lombard's state trial were admitted, containing statements about Lombard's ownership of the .22 caliber rifle; cleaning the cabin of blood; disposal of the bodies; Lombard's sale of firearms to a broker; and Hartley's and Lombard's plans to -46- 46 flee. Hartley had also testified that Lombard told him on the morning of the murders that Hartley "didn't have to take no shit from nobody"; that Lombard and Hartley on that Thanksgiving morning saw Martin and Lindsey (the victims) sleeping on couches in the living room of Hartley's cabin; and that Lombard had, after the murders, threatened to kill Hartley and Theriault if they did not "stick" to their plan to tell police, if questioned, that they had last seen the two victims on the Wednesday before Thanksgiving. Hartley's prior testimony from Lombard's state trial was admitted under the former testimony exception to the hearsay rule, see Fed. R. Evid. 804(b)(1), which ___ provides: The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness: (1) Testimony given as a witness at another hearing of the same or a different proceeding, . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. The other conditions clearly being met, the only question is whether Lombard had "similar motive" at his state trial to "develop" Hartley's testimony through cross- examination. The party against whom the prior testimony is offered must have had a similar, not necessarily an _______ -47- 47 identical, motive to develop the adverse testimony in the _________ prior proceeding. See United States v. Salerno, 505 U.S. ___ _____________ _______ 317, 326 (1992) (1992) (Blackmun, J., concurring). Because Lombard faced both liability as to murder and as to being an accomplice to murder under Maine law, he had a very forceful interest at his state trial in attacking Hartley's testimony, in order to discredit his account of the actual killings, the concealing of evidence and the attempt to escape prosecution. This interest could hardly have been any stronger at the federal trial, see United States v. DiNapoli, 8 F.3d 909, ___ _____________ ________ 914-15 (2d Cir. 1993) (en banc), and the testimony, to the extent it related to the events preceding and following the murders, was properly admitted. Hartley's prior testimony from Lombard's trial concerning the .22 caliber rifle presents a different set of issues. In contrast to the federal trial, Lombard had little real incentive at his state trial to attack Hartley's statements concerning possession or ownership of the rifle. But Lombard himself admitted during the course of his own ________ direct examination at his state trial that the .22 caliber ______ rifle belonged to him. Furthermore, other properly admitted evidence, including Tammy Theriault's testimony that Lombard owned the rifle, strongly corroborated Lombard's admission. Thus, under the circumstances presented here, we believe any -48- 48 error arising from the admission of this portion of Hartley's prior testimony was harmless beyond a reasonable doubt. Admission of Hartley's former testimony from Lombard's state trial did not violate the Confrontation Clause. See U.S. Const. amend. VI ("In all criminal ___ prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."). The Clause restricts but does not proscribe the admission of a declarant's prior testimony against a criminal defendant, requiring only that the declarant be "unavailable" and that the prior testimony sought to be admitted "bear[] adequate 'indicia of reliability,'" e.g., by "fall[ing] within a ____ firmly rooted hearsay exception." See Ohio v. Roberts, 448 ___ ____ _______ U.S. 56, 65-66 (1980). The prosecution established that Hartley was indeed "unavailable," and his former testimony at Lombard's state trial was within the firmly-rooted exception to the hearsay rule carved out for prior trial testimony that has been subjected to cross-examination. See Mattox v. United States, ___ ______ _____________ 156 U.S. 237 (1895) (holding that prior trial testimony is admissible upon retrial if declarant becomes unavailable); see also Roberts, 448 U.S. at 67-73. That testimony bears _________ _______ "sufficient 'indicia of reliability'" that there was no Confrontation Clause violation. See Roberts, 448 U.S. at 73 ___ _______ (citation omitted); Barber v. Page, 390 U.S. 719, 722 (1968) ______ ____ -49- 49 (dicta) ("where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant," his confrontation rights are satisfied). 2. Hartley's Prior Testimony from _______________________________ His Own State Trial ___________________ Approximately two pages of Hartley's testimony from his own state murder trial were admitted, containing ___ Hartley's statement that he knew that Lombard had been in prison for eight years, and a statement by Hartley's counsel _______ at a sidebar conference indicating that Hartley was prepared to testify that he believed that Lombard "was in prison for burglaries, escapes, and this sort of thing . . . ." This evidence, admitted prior to Hartley's change of plea, was relevant to the government's charge that Hartley aided and abetted unlawful firearms possession by a convicted felon. Although this former testimony was admitted as statements by a co-conspirator during the course and in furtherance of the conspiracy, a problematic ground, we find no grounds for reversal.25  ____________________ 25. The co-conspirator exception could not have applied to the former testimony, because the conspiracy had been terminated at least by the date that the co-conspirators were arrested. See United States v. Palow, 777 F.2d 52, 57 (1st ___ _____________ _____ Cir. 1985) ("[I]t is beyond doubt that the challenged post- arrest statements were not made in furtherance of the conspiracy."), cert. denied, 475 U.S. 1052 (1986); see also _____________ ________ Krulewitch v. United States, 336 U.S. 440 (1949) (statements __________ _____________ made after objectives of conspiracy have failed are not -50- 50 Lombard failed properly to preserve his arguments for appeal. He posed only a general objection by a motion in __ limine, but made no comparable objection at trial.26 That ______ was not enough. See United States v. Reed, 977 F.2d 14, 17 ___ _____________ ____ (1st Cir. 1992) ("A motion in limine without subsequent, contemporaneous objection at trial . . . is ordinarily insufficient to preserve an evidentiary ruling for appeal."). No prejudice resulted, in any event, from admission of this evidence. See United States v. Olano, 113 S. Ct. ___ _____________ _____  ____________________ admissible under the co-conspirator exception). Also, since Lombard was neither present nor represented at Hartley's state trial and had no opportunity to cross-examine him there, the testimony was not admissible under Rule 804(b)(1). Admission of the sidebar statement by Hartley's counsel as to what he believed his client was about to say presents difficulties as well, for other reasons. Cf. United States ___ _____________ v. Harris, 914 F.2d 927, 930-31 (7th Cir. 1990). Sometimes, ______ an attorney's statements may be imputed to and admitted against his client as a principal under Fed. R. Evid. 801(d)(2)(D). See Harris, 914 F.2d at 931. But cf. United ___ ______ ________ ______ States v. Valencia, 826 F.2d 169, 172-73 (2d Cir. 1987) ______ ________ (acknowledging that an attorney's statements can sometimes be used against client-defendant, but urging caution in admitting such statements in criminal context to avoid infringing defendant's right against self-incrimination, the right to counsel of the defendant's choice [i.e., insofar as admission of such a statement might require counsel to be disqualified], and the right to effective assistance of counsel). It is doubtful, though, whether this rule would apply to such an offer of proof by counsel at sidebar. In any event, even if the rule properly applied, it would only make the statements admissible against Hartley, not Lombard. See Fed. R. Evid. 801(d)(2)(D) (statement by a party's agent ___ is only admissible against that party). 26. The defendant's only contemporaneous objection to the testimony at trial was limited to specific language in the transcript of the earlier proceeding. This objection was obviated when the district court ordered the language to be redacted before the testimony was admitted. -51- 51 1770, 1778 (1993). Theriault's testimony, as well as that of her mother, independently established Hartley's knowledge of Lombard's status as a convicted felon, and Lombard himself stipulated to having committed prior felonies.27 Admission of the challenged evidence was not plain error, and there is no basis for reversal. See id. at 1777-78. ___ ___ C. Admission of Testimony About the Murders ________________________________________ The admission of a substantial amount of evidence concerning the murders, Lombard argues, was error under Fed. R. Evid. 403, because the prejudicial impact of that evidence outweighed its probative value. Lombard preserved his Rule 403 objection only with respect to the Theriault testimony. He has not met his burden of showing an abuse of discretion in the admission of that testimony. See Abreu, 952 F.2d at 1467. A decision by ___ _____ the district court on a Rule 403 determination must stand  ____________________ 27. Because Hartley's testimony from his own previous trial was introduced for the purpose of proving Hartley's knowledge of Lombard's status as a felon, and not for the purpose of providing the jury with unnecessary details about Lombard's stipulated prior felonies, there was no error under United ______ States v. Tavares, 21 F.3d 1, 6 (1st Cir. 1994) (en banc) ______ _______ ("[W]e acknowledge that in some cases evidence concerning the nature of the prior conviction will be admissible for impeachment or other reasons, despite its lack of probative _________________ value on the prior conviction element of the crime." (emphasis added)). In any event, the Tavares en banc _______ decision had not been handed down at the time of Lombard's trial (December 1993) and thus does not affect the determination of plain error. Cf. United States v. Collins, ___ _____________ _______ 60 F.3d 4, 7 (1st Cir. 1995). -52- 52 absent a demonstration of "extraordinarily compelling circumstances." United States v. Lewis, 40 F.3d 1325, 1339 ______________ _____ (1st Cir. 1994); see also United States v. Rodriguez-Estrada, ________ _____________ _________________ 877 F.2d 153, 156 (1st Cir. 1989). There are no such circumstances here. That Lombard posed no Rule 403 objection to the admission of Hartley's and even his own former testimony ___ about the murders undercuts his objection to Theriault's testimony. Her testimony about Hartley's and Lombard's conduct in connection with the murders was at least equally relevant. One of the objectives of the defendants' conspiracy charged was to "flee the State of Maine in order to avoid prosecution or the giving of testimony in connection with the homicides of Morris Martin and Paul Lindsey, Jr." The indictment also charged that the defendants conspired to "dispose of certain evidence of Henry P. Lombard's unlawful possession" of a firearm. Proof of these charges required proof of the events surrounding the murders, the defendants' knowledge of the murders, and the defendants' joint conduct following the murders. The district court recognized that it was neither possible nor appropriate to excise all evidence of the murders from the government's proof of the defendants' conspiracy. It correctly observed that the evidence touching on the murders had some prejudicial effect, but explicitly ____ -53- 53 weighed that effect against its probative value, and decided in favor of admitting much, but not all, of the testimony offered. There are no "extraordinarily compelling circumstances" that would warrant disturbing the district court's balancing of prejudice against probative value here. See Rivera-Gomez, 67 F.3d at 996-98. ___ ____________ The convictions are affirmed. The sentence on ___________________________________________________ Count 2 of the indictment is vacated, and the case is _____________________________________________________________ remanded for resentencing consistent with this opinion. _______________________________________________________ -54- 54