UNITED STATES of America, Appellee,

v.

**Leonardo Diaz GARCIA, Appellant.**

No. 86–5493.

United States Court of Appeals, Eighth Circuit.

Submitted June 9, 1987.

Decided Dec. 30, 1987.

Nicholas A. De John, Chicago, Ill., for appellant.

Jon M. Hopeman, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Before McMILLIAN, Circuit Judge, FAIRCHILD[*], Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Leonardo Diaz Garcia appeals his convictions of conspiracy to distribute heroin, 21 U.S.C. § 846 (1982); unlawful distribution of heroin, 21 U.S.C. § 841(a)(1) (1982) and 18 U.S.C. § 2 (1982); and unlawful travel in interstate commerce to promote and facilitate the unlawful distribution of heroin, 18 U.S.C. § 1952(a) (1982). On appeal he argues that the total absence of Mexican–Americans from the venire panel from which his jury was selected established a prima facie showing of purposeful discrimination and that the district court erred in denying an evidentiary hearing on this issue. He also argues that the district court[1] erred in admitting evidence of statements by his co-defendant that, taken in combination with the government's identification evidence, inculpated Diaz, and that the district court's error was precipitated by the prosecutor's misconduct in withholding from the court the nature of the government's identification evidence. We affirm the judgment of the district court.

Diaz's co-defendant Jose Chacon made contact with Drug Enforcement Adminis-

---

[*] The HONORABLE THOMAS E. FAIRCHILD, Senior Circuit Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation.

1. The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota.

tration undercover agent Harold W. Baltzer in Minneapolis and the two set up a number of heroin sales. Eventually, Baltzer and other officers flew to Chicago, where, on April 26, 1986, Baltzer purchased a pound of heroin from Chacon in a hotel room. Chacon left the room with the drug proceeds and entered a car driven by his wife, co-defendant Laurie Chacon. The Chacons drove to another part of Chicago, changing speeds, making many turns, slowing down, stopping by the side of the road, making U-turns and stopping for Chacon to make telephone calls. Surveillance officers were following the Chacons, and they described Laurie Chacon's driving patterns as counter-surveillance driving techniques. The Chacon vehicle stopped in an alley behind Troy Street. Special Agent James Ragan observed the Chacons from the end of the alley. Chacon got out of the car and met with a man in the alley. The two men walked out of Ragan's view for a while and then returned to the car and shook hands. The Chacons then left. Ragan drove into the alley and saw the man Chacon had met. Ragan drove around to Troy Street and saw the man again, this time walking toward the front of the house at 6139 South Troy. After viewing Diaz in the courtroom at trial, Ragan positively identified Diaz as the man in the alley.

Chacon later made more calls to Baltzer, which led to an agreement for Chacon to deliver two kilograms of heroin to Baltzer in Rochester, Minnesota. On June 3, 1986 government agents saw the Chacons driving into Minnesota from Wisconsin, followed by Diaz in another car. The two cars went to the motel in Rochester where Chacon was to meet Baltzer. Chacon went into the motel lounge and met with Baltzer. Diaz waited outside. Chacon told Baltzer that he had the two kilograms of heroin outside, but that he was not sure of the price. Chacon said the "man from Chicago had come along to get the money," and that Chacon would check on the price when he went out to get the heroin. Chacon left the motel and met with Diaz in the parking

lot. Diaz went to the car he had been driving, opened the hood, untied some strings near the driver's side headlights, and lifted out a large white plastic bag. Diaz gave the bag to Chacon. Diaz then removed a coat from the trunk of his car, and he and Chacon wrapped the coat around the white plastic bag. Chacon took the package into the motel, and Chacon and Baltzer went to Baltzer's motel room. In the room, Chacon told Baltzer the price for the heroin would be $825 per ounce and handed him the white plastic bag. The bag contained two kilograms of heroin. The Chacons and Diaz were then arrested and charged in this indictment.

Diaz first argues that the fact that there were no Mexican–Americans on the venire from which his jury was drawn established a prima facie case of denial of his fourteenth amendment right to equal protection. He argues that the trial court therefore erred in refusing to strike the panel and also in refusing to conduct a hearing on whether the lack of Mexican–Americans was a result of intentional discrimination.

During voir dire, Diaz requested that the veniremen be asked whether any of them spoke Spanish fluently or were "of Mexican heritage." No one answered affirmatively. Diaz then filed a Motion to Discharge the Jury, arguing that his sixth amendment[2] right to a jury trial and fourteenth amendment right to equal protection of the laws would be violated were he tried by a jury chosen from that venire. The only factual assertions stated in Diaz's motion were that none of the veniremen were "of hispanic origin or [were] Spanish speaking"; and that "[i]t can be reasonably inferred from the geographical size and demographers [sic] of the Fourth Division, that some statistically proportionate amount of a community (the Fourth Division) approximating one million people contains persons of hispanic origins, including mexicans [sic], mexican-americans [sic] and other members of a cognizable minority group."[3] Diaz made no assertion about

---

2. Diaz did not pursue the sixth amendment argument on appeal.

3. In his appellate brief and district court papers, Diaz refers to "Mexicans," "Mexican–Americans," "Hispanics" and "Spanish-speaking" per-

what proportion of the relevant population was Mexican–American, and indeed at trial his counsel admitted that the number of Mexican–Americans in the community might be negligible: "Now, with all due respect to the citizens of Minneapolis, I don't accuse them of—maybe there's only two Mexicans in the whole town."

■ Diaz's bare observation that there were no Mexican–Americans on his venire panel does not make a prima facie case of denial of equal protection. In *Batson v. Kentucky,* 476 U.S. 79, 93–96, 106 S.Ct. 1712, 1721–22, 90 L.Ed.2d 69 (1986), the Supreme Court recently reviewed the criteria for establishing a prima facie case of denial of equal protection in venire selection. The court reiterated that the burden is on a defendant alleging discriminatory venire selection " 'to prove the existence of purposeful discrimination.' " *Id.* 106 S.Ct. at 1721 (quoting *Whitus v. Georgia,* 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967)). A defendant may seek to prove purposeful discrimination, as in this case, by "proof of disproportionate impact." *Batson,* 476 U.S. at 93, 106 S.Ct. at 1721. Disproportionate impact may be demonstrated either by showing that the defendant's cognizable racial group has not been summoned for jury service over an extended period of time; or that his group is substantially underrepresented on his venire and that the venire was chosen under a practice providing the opportunity for discrimination. *Batson,* 476 U.S. at 95, 106 S.Ct. at 1722.

Diaz made no assertion and produced no evidence either that Mexican–Americans had been absent from any venire other than his own or that the proportion of Mexican–Americans in the community from which the venire was drawn was substantially different from the proportion of Mexican–Americans on his venire. Diaz gave the court no reason to conclude that the lack of Mexican–Americans on his venire was anything other than the innocent result of a lack of a significant number of Mexican–Americans in the community from which the venire was drawn.

Diaz's motion did no more than express a guess that there were enough Mexican–Americans in the district that some should have been present on the venire. This speculative argument falls far short of presenting proof that Mexican–Americans were substantially underrepresented on the venire from which the jury was drawn and that the venire was selected under a practice providing the opportunity for discrimination. We need not concern ourselves with the proof that Diaz might have presented, such as census data,[4] in an effort to confirm the mere speculation he has presented to the court. Suffice it to say, Diaz simply argued the probability that such statistics would show unconstitutional lack of representation, but failed to present any sort of statistics to show his argument had any basis in fact. The record made by Diaz therefore fails to meet the *Batson* requirements for a prima facie case of denial of equal protection.

■ Since Diaz neither made a prima facie case nor even alleged facts which, if proved, would have established a prima facie case, the court did not err in refusing to hold an evidentiary hearing on Diaz's motion. *Cf. Brown v. Lockhart,* 781 F.2d 654, 656 (8th Cir.1986) (no evidentiary hearing necessary if habeas corpus petition

sons interchangeably, although those words have distinct meanings. We presume that Diaz means to refer to "Mexcian–Americans," who were held to constitute a cognizable group for purposes of equal protection law in *Castaneda v. Partida,* 430 U.S. 482, 495, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977).

**4.** We may not find facts, but we observe that United States Census figures for 1980 show that persons identifying themselves as having at least some Mexican ancestry account for approximately .4% of the Minnesota population. Unit-ed States Department of Commerce, Bureau of Census, Ancestry of Population by State: 1980 48, 66 (1983); United States Department of Commerce, Bureau of the Census, Statistical Abstract of the United States 1987 20 (1987) (1980 figures). The district court commented that it was "familiar with the nature of the population in this district, and there is a very small Mexican–American population. So I don't believe that this motion has merit under the circumstances that exist here."

fails to state allegations which, if true, could be basis for relief).

Diaz's equal protection argument is without merit.

■ Diaz's second argument is that his sixth amendment right to confrontation was violated by the combined effect of a post-arrest statement by Chacon that he was instructed to deliver heroin sale proceeds to "someone" on April 26 and Ragan's identification of Diaz as the man who met Chacon in the alley that day.

In an out-of-court statement to Baltzer, Chacon recounted that a person called Jaime had instructed Chacon to go to a residence and give the money from the April 26, 1986 pound sale to Diaz. Under the principles of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Chacon's statement was redacted to remove references to Diaz by name, in order to avoid introducing testimony against Diaz by a witness he could not cross-examine at trial. Baltzer testified to Chacon's statement as redacted,[5] and the court charged the jury to consider the statement only against Chacon. Chacon did not testify at trial.

After the redacted statement had been introduced at trial, the government called DEA Agent Ragan to testify. Ragan testified that he followed Chacon after the April 26 sale and that he saw Chacon meet with a man in the alley behind 6139 South Troy. The two walked out of Ragan's sight. When he could see them again, they shook hands and the Chacons left. Ragan then drove through the alley and saw the man standing on a ladder. Shortly afterwards, he saw the man walking on the sidewalk next to 6139 South Troy. At trial, Ragan identified Diaz as the person whom he saw Chacon meet.

Thus, although Chacon's statement was redacted to avoid reference to Diaz by name, the identification of Diaz as the person in the alley would give the jury grounds to infer that Diaz was the "someone" to whom Chacon referred.

Diaz argues that the prosecution misled the court by failing to inform it before admission of the redacted statement that Ragan would directly identify Diaz as the man in the alley.

Though Diaz complains he was prejudiced by prosecutorial misconduct, he does not argue that introduction of Ragan's identification was unfair because Diaz was entitled to disclosure of Ragan's proposed testimony during discovery. Rather, Diaz argues that if the court had known the prosecution would introduce such an identification, it would have forbidden introduction of Jose Chacon's out-of-court statement on the grounds that the jury would perceive that Chacon's statement implicated Diaz. According to Diaz, the court would have ruled that making it possible for the jury to connect him with Chacon's statement violated Diaz's sixth amendment right to confront the witnesses against him because Chacon was a non-testifying co-defendant, not subject to cross-examination. *See generally Bruton v. United States.*

Although Diaz's appeal is founded on his *Bruton* argument, rather than his claim of prosecutorial misconduct, in light of Diaz's vigorous arguments that he was misled by the government about Baltzer's identification testimony, a few preliminary comments on the claim of prosecutorial misconduct are appropriate. At trial Diaz argued that he was not informed before trial that Ragan had failed to identify Diaz when Ragan viewed a xeroxed photograph of Diaz. The district court ruled that Diaz was entitled to know this fact under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and should have been furnished this information before Ragan testified. However, the court concluded that since the information had been fur-

---

**5.** Baltzer testified:

 Q: Did he [Chacon] make any statement to you about the events of April 26, 1986 in Chicago?
 A: Yes, sir.
 Q: What did he say?

 A: He said that after delivering the heroin to myself and after my paying him for it, he made several phone calls from pay phones and was then directed to a residence where he was directed to pay the money to someone.

nished before the government rested, there was still opportunity for Diaz to cross-examine Officer Ragan further and argue the fact of Ragan's failure to identify the photograph to the jury; accordingly, the court held there had been no violation of constitutional rights. Diaz chose not to take advantage of the district court's decision to permit recall of Ragan for further cross-examination. Diaz does not assert this issue on appeal.

Diaz limits his appellate argument to his assertion that the district court should not have admitted the redacted statement of Chacon had it known Ragan would make a direct identification of Diaz. However, the government made a lengthy record before the introduction of the redacted statement linking Diaz to the April 26, 1986 meeting. Utility records showed that Diaz maintained an account for gas for the house where the meeting took place. The utility records also had a driver's license number printed on them that was the same as the number on Diaz's driver's license, which was seized at the time of his arrest.

Furthermore, Diaz knew before trial that Ragan would give a description of the person he saw in the alley on April 26, which description would fit Diaz's characteristics, and Diaz's attorney told the court during the argument over admissibility of Chacon's statements that he expected the government to produce "evidence of a surveillance officer that's going to attempt to give a physical description of a person that's going to match the physical description of Defendant Diaz *or there's going to be a positive identification of Defendant Diaz*" (emphasis added).[6]

While the evidence that ultimately came in established direct identification of Diaz by Ragan rather than a description by Ragan that fit Diaz, we cannot conclude that this difference should mandate a different determination of the admissibility of the redacted Chacon statement. Nor can we conclude that the combined effect of admitting Chacon's statement and Baltzer's identification violate Diaz's rights to confront the witnesses against him.

The Supreme Court has recently treated the permissibility under *Bruton* of "evidentiary linkage" connecting a defendant with a co-defendant's statement, so that the co-defendant's statement indirectly implicates the defendant. *See Richardson v. Marsh*, — U.S. ——, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). In *Marsh*, the Court held that where a co-defendant's statement "was not incriminating [to the defendant] on its face, and became so only when linked with evidence introduced later at trial," the court was entitled to presume that the jury would follow a limiting instruction to consider the co-defendant's statement only against the co-defendant. *Id.* 107 S.Ct. at 1707. *Marsh* explicitly declined to further extend *Bruton*. *Id.* at 1709. Under the *Marsh* rule, the indirect inculpatory effect from linking Chacon's statements and the identification of Diaz as the person in the alley does not violate *Bruton*.

However, at oral argument Diaz attempted to distinguish his case from *Marsh* by pointing out that the *Marsh* statement was edited to eliminate all reference to the defendant's existence, whereas Chacon's statement still referred to Diaz, but was redacted by replacing Diaz's name with the neutral pronoun "someone." The Supreme Court in *Marsh* expressly declined to opine on "the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." 107 S.Ct. at 1709 fn. 5.

This court has in the past approved redaction by eliminating reference to the defendant's name, but not to his role in the crime. *United States v. Brierly*, 501 F.2d 1024 (8th Cir.), *cert. denied*, 419 U.S. 1052, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974). Cases sometimes arise in which the redacted statement alerts the jury to the fact that a name available to the prosecution has been purposely omitted, and this may improperly lead the jury to infer that the omitted name must be the defendant's. *See, e.g., Clark*

---

**6.** Counsel later backed away from this statement, saying that he did not believe anyone could positively identify Diaz from the meeting on April 26, because "[o]ur contention is that he wasn't there and didn't receive any $14,400."

*v. Maggio,* 737 F.2d 471, 476–79 (5th Cir. 1984), *cert. denied,* 470 U.S. 1055, 105 S.Ct. 1761, 84 L.Ed.2d 823 (1985). In this case, however, the language in the statement as testified to did not draw attention to the fact that the prosecution had the name available to it and purposely omitted it from the statement. Therefore, the holding in *Brierly* permits the sort of redaction used in this case.

■ Finally, even if the reference to Diaz's role were to take this case out of the rule in *Marsh,* introduction of the statement was beyond a reasonable doubt only harmless error. *See Parker v. Randolph,* 442 U.S. 62, 77–81, 99 S.Ct. 2132, 2141–43, 60 L.Ed.2d 713 (1979) (Blackmun, J., concurring), *cited with approval in Cruz v. New York,* —— U.S. ——, 107 S.Ct. 1714, 1718, 95 L.Ed.2d 162 (1987).

The conspiracy conviction on which the evidence from the confession would be relevant is firmly supported by direct evidence of Diaz's involvement in the June 3 sale. Diaz drove with the Chacons from Chicago to Rochester, Minnesota on June 3, 1986, carrying the two kilograms of heroin in his car. Diaz unloaded the heroin sold to Baltzer and waited outside while Chacon went inside the motel to deliver the heroin. Chacon told Baltzer that "the man from Chicago" had come to collect the sale proceeds, and Chacon checked on the price of the heroin by going outside where Diaz was waiting.

Moreover, even without Chacon's statement to Baltzer, Diaz was firmly linked to the April 26, 1986 transaction. Ragan saw Diaz meet Chacon in the alley behind 6139 South Troy shortly after the April 26, 1986 sale. Ragan saw Diaz and Chacon confer and shake hands. Ragan then saw Diaz approaching the house at 6139 South Troy. The government introduced utility records showing an account for Diaz at 6139 South Troy.

Diaz's counsel also allowed Chacon's counsel to elicit testimony from Ragan linking Diaz to the money from the April 26, 1986 sale:

Q (By Chacon's counsel): You were aware that that money [from the April 26 sale] had been given to Jose Chacon?

A: That is correct.

Q: And you're further aware that he was to take that money and give it to somebody before noontime?

A: That's correct.

Q: And that was one of the reasons for your following or surveiling Mr. Chacon, is that right?

A: That is correct.

Q: You wanted, in effect, to follow the money in the chain, is that right?

A: That is correct.

\* \* \* \* \* \*

Q: [Y]ou knew that a sale had just gone down, and you were trying to find out who Mr. Chacon would have contacts with?

A: That is correct.

Q: And this [the man in the alley], then would have been the first person that he was observed having contact with since the drug transaction had occurred, is that right?

A: It's the first person I have knowledge of [sic] having contact with.

This line of questioning connects Diaz to the April 26, 1986 money far more cogently than the chain of inferences Diaz complains of, and it does so without reference to any information gained from Chacon's confession. Diaz did not object to this line of questioning, though it makes any possible error from admission of Chacon's confession entirely harmless.

In the face of the overwhelming evidence against Diaz on the conspiracy count, we are able to conclude beyond a reasonable doubt that, even if admission of Chacon's redacted statement had been error, it would have been harmless. *See Parker v. Randolph,* 442 U.S. at 77, 99 S.Ct. at 2141 (Blackmun, J. concurring).

Diaz's sixth amendment right to confrontation argument has no merit.

The judgment of the district court is affirmed.