# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2207

_____

United States of America,           *
                                    *
            Appellee,               *
                                    *
        v.                          *
Abdul Wahid Al-Muqsit, also known   *
as Zachary Aaron Roan, also known   *
as Zach Roan,                       *
                                    *
            Appellant.              *


_____

No. 98-2839                          Appeals from the United States
                                    District Court for the
_____                         District of Minnesota.

United States of America,           *
                                    *
            Appellee,               *
                                    *
        v.                          *
                                    *
Benjamin Matthew Logan, also known  *
as Matt Logan,                      *
                                    *
            Appellant.              *


_____

No. 98-2980

_____

United States of America,                    *
                                             *
            Appellee,                        *
                                             *
    v.                                       *
                                             *
Dennis Kermit Michels,                       *
                                             *
            Appellant.                       *

_____

No. 98-3787
_____

United States of America,                    *
                                             *
            Appellee,                        *
                                             *
    v.                                       *
                                             *
Karl Michael Kimpton,                        *
                                             *
            Appellant.                       *

_____

Submitted:  May 11, 1999

Filed:   September 9, 1999
_____

Before MCMILLIAN, HEANEY, and FAGG, Circuit Judges.
_____

HEANEY, Circuit Judge.

-2-

The four defendants in this consolidated appeal, Abdul Wahid Al-Muqsit, also known as Zachary Aaron Roan,[1] Benjamin Matthew Logan, Karl Kimpton, and Dennis Kermit Michels, were convicted of various counts involving a conspiracy to traffic illegal guns from Minnesota to Chicago. Roan and Logan appeal from multi-count convictions and sentences for conspiracy, robbery, use of a firearm in a crime of violence, selling firearms without a license, false statements in gun transaction records, and interstate transportation of stolen firearms. Kimpton and Michels, federally-licensed firearm dealers, appeal their convictions and sentences for conspiracy and false statements on gun transaction records. For the reasons stated below, we affirm the convictions and sentences of all defendants with the exception of Logan's convictions and resulting sentence for robbery and use of a firearm in a crime of violence.

## Facts

This case arose out of a conspiracy to traffic illegally in firearms by obtaining firearms cheaply in Minnesota and reselling them at a substantial profit on the streets of Chicago. The conspiracy began in late 1991 when Roan and Chicago native Stacee Hardaway began purchasing firearms for resale in Chicago. Approximately 126 firearms were obtained from licensed dealers, including 109 firearms which came from either Kimpton, who sold firearms in Wells, Minnesota, or Michels, who sold firearms in North Mankato, Minnesota. Firearms were also obtained through a home burglary and the robbery of Lloyd's Gun Shop in Minneapolis. Hardaway, Roan, and Logan transported the firearms to Chicago.

The purchase of such a large number of firearms in a short period of time from federally-licensed dealers without detection by the Bureau of Alcohol, Tobacco and

_____

[1]At the time of the crimes and during trial, Al-Muqsit was known by his former name, Zachary Roan. Thus, he will be referred to as "Roan" in the text of this opinion.

Firearms (ATF) required falsification of ATF forms. For each gun purchase the dealer was required to complete ATF form 4473, which recorded the name, address, and other information for the person who received the firearm. Federal law in 1991 did not limit the total number of firearm purchases any individual could make or the frequency of those purchases. However, it did require licensed gun dealers to notify ATF of any person who purchased more than one handgun in a five-day period. Kimpton and Michels conspired with Hardaway and Roan to evade this requirement through the use of "straw purchasers," purchasers who filled out the forms for guns bought by and transferred to Hardaway and Roan.

The conspirators' desire for more firearms to sell in Chicago eventually led to a home burglary in Mankato and the armed robbery of Lloyd's Gun Shop in Minneapolis. In the latter, two clerks were murdered. On the evening of June 23, 1992, clerks Tim Foslien and Brian Maas were fatally shot during a robbery in which approximately ninety guns, including semi-automatic handguns, revolvers, rifles, shotguns, and stun guns were stolen from the store .

According to the testimony of Betty Cole Hardaway, Roan and Logan arrived at the Mankato apartment she shared with Darren Hardaway on the evening of June 23rd. According to Cole, Logan announced that he and Roan had gone to the gun store, that there had been two men there, and that he and Roan had each shot one person in the head. Logan told Cole and Hardaway that the man he had shot in the head had first been wounded in the side. Logan then showed Cole and Hardaway the stolen guns. Around midnight that night, Cole and Hardaway drove to Chicago, followed by Roan and Logan.

On June 25, 1992, three Chicago police officers observed Hardaway get out of a Mercury Cougar near a public telephone on Chicago's West Side while wearing a

gun.[2]  Roan was in the passenger seat and Logan was in the driver's seat.  Police stopped the men, finding a loaded 9mm Glock handgun on Roan and a loaded .40 caliber semi-automatic Glock handgun on Logan.  The officers arrested the three men for misdemeanor handgun possession.  Upon searching the car, police found a number of additional guns, gun shop receipts, and a key from the Presidential Inn, room 123.  When police searched the hotel room the next day, they recovered several items including a receipt from Karl's Gun Shop bearing Roan's name, undeveloped photo negatives that later revealed photographs of Roan posing with a gun pointed at the camera, a stun gun, and a chrome Davis Industries P-380 handgun.  Further investigation revealed that three of the shell casings recovered from Lloyd's–including those matching the bullet that killed Foslien, and two of the bullets fired into Maas–had been fired from the chrome Davis Industries P-380 gun seized from the hotel room.  Maas was killed by a bullet fired to the back of the head from the gun Logan was carrying when the two men entered the store.

All three men were advised of their Miranda[3] rights and taken into custody.  Because of the number of guns seized, Chicago police contacted the ATF.  After checking the guns' serial numbers on a national computer system, Chicago police learned that some of the guns had been stolen during the double homicide in Minneapolis, and contacted the Minneapolis Police Department.  Officers Morrill and DeConcini of the Minneapolis Police Department flew to Chicago the morning of June 26, 1992.  While being questioned, Darren Hardaway directed officers to Kelvin McCollum's home in Chicago where Roan allegedly slept the night of June 24, 1992.  The police recovered another eighteen guns, including three from the Lloyd's Gun Shop

----

[2]Cole stated that Roan and Logan drove a beige Mercury Cougar from Mankato to Chicago.

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

robbery, a grinder to remove serial numbers from guns, drug paraphernalia, and $12,000 in cash.

An ATF agent first questioned Roan on June 25, 1992, before ATF learned of the connection with the Minneapolis murders. Officer DeConcini interviewed Roan at approximately 2:30 p.m. on June 26, 1992. At that time, Roan declined to discuss the matter. DeConcini interviewed Roan again shortly after midnight on June 27, 1992, and Roan again declined to discuss the matter. Prior to each interview, DeConcini read Roan his Miranda rights. Between 12:15 and 12:30 a.m. on June 27, 1992, DeConcini and a Chicago police officer decided to confront Roan with the evidence in the case. As Roan was escorted from his interview room into a large roll-call room where the guns and other evidence seized from McCollum's home were displayed, an officer again read Roan his Miranda rights. Roan stated "Okay. I did it." He then proceeded to explain his role in the murders.

Roan told police that he and Logan went to the gun store in Minneapolis the day before the murders, intending to kill the employees and steal weapons. When they arrived, three employees were present. He believed all three were armed and thought he didn't have enough bullets to "do" everyone in the store. He and Logan returned the next day just before the store closed at 7:00 p.m. After the few customers left, Roan walked toward the cash register, pulled out his Davis Industries .380 handgun and shot one of the clerks (Foslien) in the forehead from about seven feet. He turned and shot the other clerk (Maas) twice. He said he then heard another shot. He and Logan emptied a cardboard box, collected weapons, and put them in the box. They returned to Mankato, switched cars, and drove to Chicago.

Roan explained that prior to the murders he had bought guns and sold them on the street for profit. Roan told police that after a Mankato gun shop owner became nervous about selling him so many guns and refused to sell to him, he had to commit the murders in order to obtain additional guns. Roan identified the Davis Industries

.380 semi-automatic handgun present in the roll-call room as the gun he used during the robbery and homicide. He also identified the cardboard box used to load the guns. Police then summoned a court reporter who took a formal statement from Roan at approximately 1:20 a.m.

Police also began questioning Logan after he was picked up. Logan initially denied knowing anything about the double homicide in Minneapolis and claimed that he and Roan had purchased the guns in Milwaukee. Later Logan was questioned by Morrill for approximately thirty to forty-five minutes without anyone else present. Logan spoke voluntarily with Morrill, but the conversation was not tape recorded or transcribed.

Logan subsequently gave a recorded statement in which he recounted that after he and Roan had been in the gun shop approximately five minutes, Roan pulled out his gun, shot one of the clerks, and then turned and fired two to three times at the other clerk. Next, Logan claimed that he took his gun out of his pocket and placed it on the counter before going to check the pulse of the clerk Roan had shot in the head. While checking the clerk's pulse, he heard another shot. Roan then began yelling at him to help gather the guns and take them to the car, which Logan did. Logan stated that when he saw his own gun laying on the floor, he picked it up and returned it to his pocket. Evidence later showed that the second clerk had been shot in the head with Logan's gun. At trial, Logan maintained that he had had no knowledge that Roan intended to rob the gun store, and thought that Roan intended to buy a gun at Lloyd's, since Roan often purchased guns. Logan testified that after the murders he did what Roan told him to because he was afraid of Roan.

Logan and Roan were tried separately in Minnesota state court on first-degree murder charges. Both were convicted and sentenced to consecutive life terms. Roan's conviction was upheld on appeal. See State v. Roan, 532 N.W.2d 563 (Minn. 1995). The Minnesota Supreme Court overturned Logan's conviction, see State v. Logan, 535

N.W.2d 320 (Minn. 1995), and he was acquitted on retrial. Roan refused to testify at the second trial and was found in contempt. Following the completion of the state court trials, federal charges were filed against Hardaway, Roan, Logan, Kimpton, Michels, and four of the straw purchasers. Roan, Logan, Kimpton, and Michels were tried together and convicted. The rest of the defendants, including Hardaway, who testified at trial, pled guilty.

## Discussion

## I. Individual Claims

### A. Michels and Kimpton

Relying on the plain language of the relevant statute, Michels and Kimpton argue that because they are federally-licensed firearms dealers, their record-keeping offenses are misdemeanors under 18 U.S.C. § 924(a)(3) rather than felonies under 18 U.S.C. § 924(a)(1)(A). We review this question of statutory interpretation de novo. See United States v. Williams, 136 F.3d 547, 550 (8th Cir. 1997).

Count 1 of the indictment alleged that all defendants knowingly and willfully conspired to violate 18 U.S.C. § 924(a)(1)(A). Section 924(a)(1)(A) and (D) state in relevant part:

> (a)(1) Except as otherwise provided in this subsection, . . . whoever–
>     (A) knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter;
>         . . . .
>     (D) willfully violates any other provision of this chapter,

shall be fined under this title, imprisoned not more than five years, or both.

Id. Michels and Kimpton argue that the statutory scheme of § 924 requires that they be charged under § 924(a)(3) as follows:

> (3) Any licensed dealer, licensed importer, licensed manufacturer, or licensed collector who knowingly–
>
> (A) makes any false statement or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter . . .
>
> . . . .
>
> shall be fined under this title, imprisoned not more than one year, or both.

Id. They argue that in implementing this provision, Congress intended to limit the criminal liability of federally-licensed gun dealers for false statements on ATF forms to those violations committed knowingly. They reason that because the 18 U.S.C. § 922(m) count **S** a willful violation of which would qualify for felony punishment under § 924(a)(1)(D) **S** was dismissed prior to trial, only § 924(a)(1)(A) remains, which by its terms applies only to a knowing violation. As an initial matter, we reject the government's contention that the use of the word "willfully" in the conspiracy language of Count I transforms the mens rea of the substantive offense of § 924(a)(1)(A) from knowingly to willfully in order to incorporate § 924(a)(1)(D). Section 924(a)(1)(A) was the only remaining count against Michels and Kimpton; thus, they cannot be charged with willfully violating that statute.

We do not, however, agree with Michels and Kimpton that they could not properly be charged under § 924(a)(1)(A). There is simply nothing in the language or legislative history of the statute or legislative history to indicate Congress intended to do anything more than allow for the option of misdemeanor prosecution for licensed dealers who make false statements on ATF forms, while leaving intact the felony prosecution structure for those such as Michels and Kimpton whose flagrant and

repeated actions in accepting false ATF forms from straw purchasers and backdating ATF forms to avoid notification requirements warrants felony punishment.

The legislative history of the Firearm Owners Protection Act of 1986, which added the misdemeanor provisions of § 924(a)(3), suggests these amendments were intended "to ensure that law-abiding citizens would not be subject to severe criminal penalties for unintentional missteps." United States v. Obiechie, 38 F.3d 309, 312 (7th Cir. 1994).  Although not a model of clarity, we believe the two provisions of § 924 reflect a legislative compromise–the sponsors of § 924(a)(3) wanted to ensure that technical or unimportant violations would not be punished too harshly[4] while allowing for felony prosecution of more serious offenses.  This sentiment is reflected in the Congressional Record:

> The aim of the Firearm Owners Protection Act is to redirect law enforcement toward the kind of transaction most likely to be a factor in violent firearms crime.  In other words, we have to stop going after the guy who transposes a number in a zip code, and go after the dealer who is knowingly selling stolen guns, or knowingly selling to prohibited persons.

132 Cong. Rec. 9603 (1986) (remarks of Sen. McClure).  Without the option of charging dealers under the felony provisions of § 924, it would be impossible for law enforcement to "go after" the first link in a chain which results in a plentiful supply of firearms for use in violent crime.  We do not believe that Congress intended to insulate from punishment dealers such as Michels and Kimpton who knowingly participate in an illegal gun trafficking scheme that puts hundreds of firearms in the hands of Chicago gang members.

---

[4]In the words of a sponsor, this Senate floor amendment was intended to ensure that the dealer would not be "subjected to harsh felony penalties for technical violations of the rigid record-keeping standards" of the Act. See 131 Cong. Rec. 18,187 (1985) (statement of Sen. Hatch).

-10-

**B. Zachary Roan**

Roan makes three additional arguments on appeal. First, he argues that officers violated his <u>Miranda</u> rights by approaching him after he terminated the interrogation, and that the district court therefore erred in denying his motion to suppress the confession he made to officers in Chicago. Roan also contends that he was deprived of a fair trial when counsel for codefendant Logan improperly commented on Roan's failure to take the stand at trial. Finally, Roan asserts sentencing errors.

Roan initially answered questions during the first interview, but according to the questioning officer, when the interview "got to questions about the crime itself . . . he told me that he wasn't ready to talk about that at that time." The same officer approached Roan ten hours later and Roan again talked with him generally at first, but when the subject of the murders was again raised, Roan stated, "I don't think right now." Approximately ten minutes later several officers brought Roan to the evidence room where he then confessed.

Roan argues that his statements invoked his right to remain silent and that the subsequent questioning in the evidence room violated this right. Roan cites <u>Michigan v. Mosley</u>, 423 U.S. 96 (1975), for the proposition that once he asserted his right to silence, questioning could not resume, particularly not in the next ten minutes. In <u>Mosley</u> the Court held that once the suspect asserts his right to remain silent, it must be "'scrupulously honored.'" <u>See</u> <u>id.</u> at 103 (quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966)). The Court ultimately found that the suspect in <u>Mosley</u> could be approached again for questioning about a *different* crime after having asserted his right to remain silent in an earlier interview regarding the crime about which he was taken in for questioning." <u>See</u> <u>id.</u> at 104-06. Roan argues that this is the only situation in which officers do not violate <u>Miranda</u> when they resume questioning after a suspect has ended an interrogation. The <u>Mosley</u> case does not support this conclusion, however, because it fails to discuss under what circumstances questioning may resume about the

-11-

same crime. It simply states that the answer to the question of when interrogation may resume is neither "never" nor "immediately." See id. at 101-02. Instead, the courts must examine whether the assertion of the right was scrupulously honored.

The district court found that Roan's declaration did not "unequivocally express an interest in having his questioning end." We review this determination for clear error. See United States v. Cody, 114 F.3d 772, 775 (8th Cir. 1997). We agree that the right to remain silent was never evoked given the nature of Roan's statements. This case is analogous to United States v. Thompson, 866 F.2d 268 (8th Cir. 1989), in which the suspect indicated that he wanted to "sleep on it" before he talked with police and that he would "wait a little while" before he was interviewed. Id. at 270. He was moved shortly thereafter and interviewed approximately thirty minutes after he had made the request to wait. He signed a waiver of his Miranda rights and confessed This court held that Thompson's statements were not sufficient to invoke his right to silence. See id. at 271. Roan's statements are similar and require the same conclusion.

Roan next argues that the district court abused its discretion in refusing to grant a mistrial after counsel for Logan inappropriately commented during closing argument on Roan's failure to take the stand in his own defense. Specifically, Logan's counsel pointed out to the jury during his closing statement that Logan had been questioned and requestioned about the offense for six years, whereas all the jury had from Roan was a piece of paper with his post-arrest statement implicating Logan. Counsel continued: "[J]ust how in the hell do I cross examine this statement? How do I cross examine this piece of paper and find out what's true and what's false?" (Tr. at 2402-03.) Later in closing counsel stated, "I can't ask [Roan] why he said the things he said. I can't cross examine Mr. Roan. Wouldn't I like to be able to." (Tr. at 2425.)

The Fifth Amendment protects Roan's choice to remain silent and not testify in his own defense. See United States v. Harris, 956 F.2d 177, 181 (8th Cir. 1992). And a comment by a codefendant's counsel regarding a defendant's failure to testify violates

-12-

the defendant's right to a fair trial, if not the defendant's Fifth Amendment right. See United States v. Anderson, 879 F.2d 369, 379 n.4 (8th Cir. 1989) (citing Hayes v. United States, 329 F.2d 209, 222 (8th Cir. 1964)). Roan looks to de Luna v. United States, 308 F.2d 140 (5th Cir. 1962), in support of his argument that the comments of Logan's counsel warrant reversal. In de Luna, one codefendant, Gomez, testified and the other, de Luna, did not. Gomez claimed that he had been an innocent victim of circumstance when de Luna–a passenger in Gomez's car–saw the police coming, tossed Gomez a package of narcotics, and told him to toss it out the window. De Luna did not testify, but his lawyer theorized he had never tossed the package to Gomez. In response, counsel for Gomez argued to the jury, "Well, at least one man was honest enough and had courage enough to take the stand and subject himself to cross examination and tell you the whole story," and "You haven't heard a word from this man (de Luna)." Id. at 142. The de Luna court held that the improper comments warranted reversal, enumerating several factors that were critical to its decision, including "the head-on collision between the two defendants, the repetition of the comments, and the extended colloquy over the comments between the trial judge and the lawyers." Id. at 154.

In this case, the government concedes and the district court agreed that the remark was improper. The government argues, however, that Roan was not denied his right to a fair trial since the comments only referred to Roan's refusal to testify in an attempt to undermine the reliability of his confession, which implicated Logan, and did not imply that Roan was guilty. The government further argues that the comment could not have affected the jury's verdict, given the overwhelming evidence of Roan's guilt and lack of an articulable theory of innocence. We agree that the facts of this case differ significantly from de Luna. The improper comments here were not as inflammatory or suggestive of guilt as the comments in de Luna or repeated and emphasized in the same manner. Furthermore, we agree with the reasons advanced by the government supporting the conclusion that the statements did not affect the verdict. See United States v. Patterson, 819 F.2d 1495, 1506 (9th Cir. 1987).

-13-

Finally, Roan challenges his lengthy sentence, which resulted from the application of United States Sentencing Guidelines Manual § 5G1.2(d) (1998). Section 5G1.2(d) provides:

> If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

Thus, although the statutory maximum penalty for robbery is twenty years, Roan was sentenced on each count concurrently until he arrived at the life sentence provided for under U.S.S.G. § 2B3.1(c)(1), which states: "If a victim was killed under circumstances that would constitute murder under 18 U.S.C. §1111 [defining murder in the perpetration of robbery as first degree murder] . . . apply §2A1.1." Section 2A1.1 assigns the offense level for first-degree murder at 43. Roan does not challenge the application of § 5G1.2(d) to his sentence; he rather claims that the provision is unconstitutional. Numerous circuits have upheld the constitutionality of this provision against due process challenges. Our court has also upheld sentences applying the provision. See United States v. Rodgers, 122 F.3d 1129, 1131 n.2, 1132 (8th Cir. 1997). We see no error in this application of the guidelines and affirm.

### C. Benjamin Logan

Logan presents four individual grounds for reversal. Logan asserts that the district court erred in failing to dismiss his indictment for pre-accusatory delay or on double jeopardy grounds. Logan also contends that the district court abused its discretion in failing to give a "missing witness" instruction. Finally, Logan argues that the life sentence he received for a robbery conviction violates due process.

Logan first contends that the district court erred in failing to dismiss the indictment for preaccusatory delay. While statutes of limitations provide "'the primary guarantee against bringing overly stale criminal charges,'" United States v. Marion, 404 U.S. 307, 322 (1971) (quoting United States v. Ewell, 383 U.S. 116, 122 (1966)), constitutional due process has a "limited role to play in protecting against oppressive delay," United States v. Lovasco, 431 U.S. 783, 789 (1977). Dismissal of an indictment due to preindictment delay is warranted only where a defendant can establish "'that the delay was unreasonable and that it actually and substantially prejudiced the presentation of [the] defense.'" Bennett v. Lockhart, 39 F.3d 848, 851 (8th Cir. 1994) (quoting United States v. Miller, 20 F.3d 926, 931 (8th Cir. 1994)). Only if actual prejudice is established will the court inquire into the reasons for the delay and balance them against the demonstrated prejudice. See Miller, 20 F.3d at 931. To prove actual prejudice, Logan must specifically identify witnesses or documents lost during the delay properly attributable to the government, relate the substance of the testimony which would be offered by the missing witnesses or the information contained in lost documents in sufficient detail to permit a court to assess accurately whether the information was material to his defense, and show that the missing testimony or other evidence is not available from alternate sources. See United States v. Bartlett, 794 F.2d 1285, 1289-90 (8th Cir.), cert. denied, 479 U.S. 934 (1986). We review a district court's determination of actual prejudice on a clearly erroneous standard. See id. at 1291 n.7.

The evidence presented by Logan falls far short of that necessary to establish actual prejudice. The only prejudice alleged by Logan was diminishment of witness memory due to the loss of witnesses or passage of time. However, even if such diminishment could be shown to be material, there were ample alternate sources for this evidence given that Logan had access to the records from three earlier state court trials concerning the events of the robbery. Because these records remained available to Logan, he cannot hope to establish actual prejudice. See Bartlett, 794 F.2d at 1290-91; United States v. Mmahat, 106 F.3d 89, 94-95 (5th Cir. 1997). Accordingly, the district

court did not err in denying Logan's motion to dismiss the indictment for preaccusatory delay.

Logan next claims that the district court erred in denying his motion to dismiss his indictment on double jeopardy grounds. Specifically, Logan claims that the federal gun-trafficking charges were a "sham" designed to vindicate Minnesota's interest in obtaining a conviction. As a general matter, of course, prosecution by multiple sovereigns poses no constitutional difficulty. See Heath v. Alabama, 474 U.S. 82, 88 (1985) ("When a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences.'" (quoting United States v. Lanza, 260 U.S. 377, 382 (1922)). However, where the federal prosecution was merely a sham for state prosecution because it either vindicates interests that the state could not itself advance or is suggestive of collusion on the part of state and federal prosecutors, the dual sovereignty doctrine does not apply. See United States v. Williams, 104 F.3d 213, 216 (8th Cir. 1997).

Logan asserts that his federal prosecution is merely a sham intended to rectify the state's failure to obtain a conviction, because despite an ATF investigation and inventory in connection with the robbery, the United States did not indict Logan until after he was acquitted of felony murder in Minnesota state court. This argument ignores that the obvious interest of the federal government in prosecuting interstate trafficking of firearms exists entirely independently of Minnesota's interest in obtaining a conviction for felony murder. As to the alleged collusion between federal and state officials, it is well established that "cooperation between state and federal authorities does not amount to unlawful collusion." Williams, 104 F.3d at 216. Although we have recognized that at some point coordination between independent sovereigns may support an allegation of sham prosecution, this case presents no occasion to demarcate that line.

-16-

Logan's third individual claim concerns his contention that the district court abused its discretion in failing to give a missing witness instruction concerning a retired police officer whose testimony Logan asserts would have "elucidate[d]" events. Upon carefully reviewing the facts presented by Logan in light of the law of this circuit, we find no merit to Logan's third individual claim.

Logan's fourth and final individual claim asserts that his sentence of 540 months violates due process. Logan was convicted of robbery, conspiracy, gun-trafficking, and use of a firearm in a crime of violence. Following applicable sentencing guidelines provisions, the district court correctly established Logan's total offense level at 43. The recommended guidelines sentence of life imprisonment was adjusted to comply with the statutory maximum sentences set for each of Logan's offenses, yielding a total sentence of 540 months. Logan does not object to the district court's calculation of his sentence, but rather argues that this case falls into the category the Supreme Court had in mind when it observed that "the preponderance standard th[is] Court approved for garden variety sentencing determinations may fail to comport with due process where . . . a sentencing enhancement factor becomes 'a tail which wags the dog of the substantive offense.'" United States v. Townley, 929 F.2d 365, 369 (8th Cir. 1991) (quoting McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986)). We disagree.

In United States v. Lombard, 72 F.3d 170 (1st Cir. 1995), the First Circuit addressed the situation referred to in McMillan. The defendant in Lombard had been convicted in federal court of possession of a firearm under 18 U.S.C. § 924(e), but had earlier been acquitted in state court of a murder charge stemming from the same underlying events. The district court in that case applied the murder guideline, resulting in a life sentence.[5] In calling into question the constitutional propriety of adherence to

[5]In Lombard, there was no stated statutory maximum for the firearms offense, so the cross-reference to the murder guideline displaced the lower guidelines range that would have otherwise applied. See 72 F.3d at 178.

the sentencing guidelines in such a circumstance, the First Circuit panel emphasized that Lombard "received a life sentence based on the federal court's finding that it was more likely than not that Lombard had committed the murders of which he had been acquitted." Id. at 171. That is not the case here. Logan was convicted by a federal jury of armed robbery. United States Sentencing Guidelines Manual § 2B3.1(c)(1) (1998) provides that "if a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such a killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder)." In turn, 18 U.S.C. § 1111(a) defines "murder" to include felony murder. In this case, there is no question but that Logan could have been convicted of felony murder. Thus, the decision in Lombard is easily distinguishable. Logan's other arguments concerning the constitutionality of his sentence are without merit. Accordingly, each of Logan's individual claims is rejected.

## II.  Denial of Motions for Severance

Each of the defendants argues that the district court abused its discretion in denying his motion for severance. See United States v. Jackson, 64 F.3d 1213, 1217 (8th Cir. 1995) (district court's decision to deny severance is reviewed for abuse of discretion). The district court may grant a severance where a defendant shows that he is prejudiced by a joint trial. See id. (abuse of discretion standard requires showing of clear prejudice); see also Fed. R. Crim. P. 14. Roan complains that he was prejudiced by Logan's attempts to place the entire blame for the robbery on him. Kimpton and Michels assert that they were unable to receive a fair trial because their crimes were tried along with a violent robbery and double homicide. Logan claims that his defense was irreconcilable with that of Roan and that he was prejudiced by his inability to present evidence of Roan's gang affiliation, both evidentiary matters which resulted from being tried with Roan. Logan also asserts that the admission of Roan's post-arrest statements in redacted form violated his Confrontation Clause rights under the Sixth Amendment. With the exception of Logan's Confrontation Clause claim, we find that

-18-

the denial of severance under any of these circumstances did not result in "severe or compelling prejudice" to the accused necessitating reversal. See United States v. Koskela, 86 F.3d 122, 126 (8th Cir. 1996); see also United States v. Lane, 474 U.S. 438, 449 (1986) (reversal is required only if joinder had substantial and injurious effect or influence in determining jury's verdict).

Federal Rule of Criminal Procedure 8(b) provides for the joinder of defendants alleged to have participated in the same criminal activity, and "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993). This court has stated that "'rarely, if ever, will it be improper for co-conspirators to be tried together.'" United States v. Patterson, 140 F.3d 767, 774 (8th Cir. 1998) (quoting United States v. Wint, 974 F.2d 961, 965 (8th Cir. 1992). In order to prevail, a defendant must establish "more than the mere fact that his chances for acquittal would have been better had he been tried separately. He must affirmatively demonstrate that the joint trial prejudiced his right to a fair trial." United States v. O'Connell, 841 F.2d 1408, 1432 (8th Cir.1988).

Kimpton and Michels make the former type of argument–that the nature of the evidence presented by or against their co-conspirators made the jury more likely to convict. They point to no more specific prejudice suffered, and thus their claims must be rejected. Michels' and Kimpton's further argument that their "minor" role in the conspiracy necessitated severance similarly fails because limited involvement in a conspiracy does not warrant severance. See United States v. Pecina, 956 F.2d 186, 188 (8th Cir. 1992).

Roan fails to point to denial of a specific trial right or present a claim of severe or compelling prejudice resulting from Logan's efforts to blame him entirely for the robbery, and his claim therefore fails.

Logan makes three specific arguments of prejudice suffered from the district court's failure to order a severance. Logan first asserts that he was entitled to severance because his defense that he was unaware that Roan intended to commit the robbery and acted under duress after the shootings was irreconcilable with Roan's defense which involved no articulable theory. He recognizes that simply antagonistic defenses do not entitle codefendants to severance under Zafiro, but rather the defendant must show legally cognizable prejudice. See 506 U.S. at 541. Logan has shown no such prejudice resulting from conflict between his and Roan's defenses, and we therefore reject this claim.

Similarly, Logan's second claim that he was prejudiced by the district court's refusal to allow him to testify as to Roan's gang affiliation in order to support his duress claim fails because, contrary to Zafiro, Logan has failed to point to any specific trial right that was compromised. See 506 U.S. at 539. Moreover, even if Logan could articulate a specific trial right that was denied, he has failed to show any resulting prejudice, considering that he testified at length that he witnessed Roan murder two people and that Roan threatened him. This was certainly ample evidence for the jury to find duress if they were so inclined.

A more difficult question is presented by Logan's third claim that his rights under the Confrontation Clause were violated and he suffered prejudice when Roan's post-arrest statements implicating him were presented to the jury in a manner that violated Bruton v. United States, 391 U.S. 123 (1968). Bruton held that it is unduly prejudicial in a joint trial to admit a codefendant's post-arrest statement if the statement directly implicates a codefendant and that such an admission violates the Sixth Amendment confrontation right of the codefendant. See 391 U.S. at 126.

At trial, detective Walsh, one of the detectives who spoke with Roan after his arrest, redacted Logan's name from the confession by testifying that Roan told him he had committed the robbery with "another individual." (Tr. at 1366-67). Logan claims

that this testimony invited speculation that the prosecution was withholding the name and led the jury to infer that the name was his. Logan asserts that since the government had notice that his defense would be coercion, Roan's redacted confession compelled the conclusion that Logan was the person referred to who, according to Roan, planned and participated in the robbery and fired the shot that killed Maas. Since Roan did not take the stand, Logan was unable to cross-examine him regarding this statement.

In <u>Richardson v. Marsh</u>, 481 U.S. 200 (1987), the Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate *not only the defendant's name, but any reference to his or her existence*." <u>Id.</u> at 211 (emphasis added). The Court specifically noted that it expressed no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun. Thus, the government's reliance on <u>Richardson</u> is obviously misplaced. In <u>Richardson</u>, the Court approved a nontestifying codefendant's admission where the trial court had removed all indication that another person was present in the car when the robbery was planned. <u>See</u> <u>id.</u> at 203. In the instant case, unlike in <u>Richardson</u>, Roan's statement made reference to the fact that "another individual" had planned the robbery with him, thereby alerting the jury to the existence of a codefendant.

Subsequently in <u>Gray v. Maryland</u>, 118 S. Ct. 1151 (1998), the Court held that redactions, such as an obvious blank or the use of the word "delete," which replace the name in such a way as to notify the jury that the name has been deleted violate the confrontation clause. <u>See</u> <u>id.</u> at 1155. However, so long as the redacted confession or admission does not facially incriminate or lead the jury directly to a nontestifying declarant's codefendant, this court has consistently upheld the admission of evidence. Recently, for example, in <u>United States v. Edwards</u>, 159 F.3d 1117 (8th Cir. 1998), we concluded that the district court's decision to admit the statements of a nontestifying defendant, redacted as to codefendants by the use of "we" and "they" in reference to

-21-

a large cast of characters from a certain neighborhood, and accompanied by appropriate limiting instructions, was consistent with this court's decisions and with <u>Gray</u>, which approved the use of a phrase such as "Me and a few other guys." <u>See</u> <u>id.</u> at 1125-26 (quoting <u>Gray</u>, 118 S. Ct. at 1157); <u>see</u> <u>also</u> <u>United States v. Jones</u>, 101 F.3d 1263, 1270-71 & n.5 (8th Cir. 1996) (use of "we" and "they"); <u>United States v. Garcia</u>, 836 F.2d 385, 390-91 (8th Cir. 1987) ("someone"). However, in <u>United States v. Long</u>, 900 F.2d 1270 (8th Cir.1990), we held that a codefendant's statement to an FBI agent replacing the defendant's name with "someone" was improperly admitted under <u>Bruton</u> because the codefendant's cross-examination of the agent "led the jury straight to the conclusion that 'someone' referred to [the defendant]." <u>Id.</u> at 1279-80.

The government further argues that Roan's confession is admissible because, like that of the nontestifying codefendant in <u>Richardson</u>, "the [redacted] confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." 481 U.S. at 208. We are not persuaded. This statement can only be read in the context of the facts and holding of <u>Richardson</u>, which require the redaction of all references to the existence of the defendant.

The facts in this case are quite unlike the facts in <u>Gray</u> and many of our own cases dealing with <u>Bruton</u> violations where the defendant simply claimed that he was not present when the crime was committed and/or objected to the use of a very general reference to other persons such as "we" or "they." Instead, testifying in his own defense, Logan's claim was that he was unaware of Roan's plan to rob Lloyd's Gun Shop, but rather thought that Roan intended to purchase a gun as he had done many times in the past.[6] Thus, Roan's redacted statement that he had planned the robbery

---

[6]This claim is quite similar to that of the defendant in <u>Richardson</u>, who admitted that she had been present at the robbery but claimed that she did not know that the codefendants were armed and intended to rob or harm the victims when the three of them went to their house. One nontestifying codefendant confessed that he and the

with "another individual" cannot be considered a generalized reference, but rather a much more specific and direct reference serving as a damaging piece of evidence going directly to the heart of Logan's defense.[7] The nature of this statement highlights the importance of <u>Richardson's</u> requirement that all references to the existence of the defendant be eliminated. In <u>Richardson,</u> the defendant's own testimony simply placed herself in the car where the conversation took place. The admitted statement of her nontestifying codefendant in no way touched on that codefendant's opinion of whether she had heard the conversation, leading to only an inferential connection. In this case, the specific nature of Roan's statement makes the connection less inferential and more like the specific evidence the <u>Richardson</u> Court referred to as "more vivid than inferential incrimination, and hence more difficult to thrust out of mind." 481 U.S. at 208. Thus, the admission of Roan's statement cannot be said to fit within the narrow exception created by <u>Bruton</u> and its progeny.

Since the trial court did not eliminate this reference, Logan had a constitutional right to confront this statement through cross-examination to try to show that in fact, as Logan claimed, he had only provided Roan with the ride to Minneapolis to buy a gun that he requested the day of the robbery. The replacement of Logan's name with the

---

other nontestifying codefendant were the two who had discussed the robbery and the probable need to kill the victims on the way to their house. The testifying codefendant admitted that she had been in the car with the two, but claimed that she had been unable to hear the conversation because the radio was playing loudly. The admitted confession made no reference to the fact that the defendant had even been present in the car.

[7]The analysis found in <u>Gray</u> and in our cases such as <u>Garcia</u> and <u>Long</u>, approving and disapproving the use of the neutral pronoun "someone" is not helpful in this situation because it focuses on whether the redaction invites speculation on the part of the jury as to whether the name has been omitted and asks them to fill in the blank. Here, the issue was not filling in the blank, but the substance of the statement that the robbery had been planned with the individual.

phrase "another individual" was thus entirely useless in protecting Logan's rights under the Confrontation Clause, and we find that those rights were infringed upon in violation of <u>Bruton</u>.

Our conclusion that the admission of Roan's post-arrest statement violated Logan's constitutional rights under the confrontation clause does not end our analysis. <u>Bruton</u> errors are subject to constitutional harmless-error analysis. <u>See</u> <u>Garcia</u>, 836 F.2d at 391. Evidentiary rule violations affecting a defendant's constitutional rights are analyzed under <u>Chapman v. California</u>, 386 U.S. 18 (1967). <u>See</u> <u>United States v. Williams</u>, No. 98-3422, 1999 WL 410110, at *6 (8th Cir. June 22, 1999). If this alleged error was harmless beyond a reasonable doubt, the conviction should be affirmed irrespective of whether the district court committed error in admitting the testimony. <u>Id.</u> In other words, our task is to "determine whether the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the co-defendant's statement is so insignificant, that it is beyond a reasonable doubt that improper use of the statement is harmless." <u>United States v. Beale</u>, 921 F.2d 1412, 1425 (11th Cir. 1991).

Since Logan was charged only with robbery and not murder, the key issue at trial was whether he in fact planned and participated in the robbery, and we look to the properly admitted evidence of such. In addition to the admission of Roan's redacted statement that "another individual" had planned and participated in the robbery with him, the major evidence that Logan did in fact plan and participate in the robbery was the testimony of Betty Cole Hardaway.

Cole Hardaway testified that Darren Hardaway (her boyfriend at the time of the crime and her husband at trial) told her that Roan and Logan had talked about robbing a gun store and that they were "up there" [Minneapolis] earlier that day but the store was closed. (Tr. at 287.) She testified that after the robbery Roan and Logan came with the guns to the apartment in Mankato she shared with Darren Hardaway, and

-24-

calmly told them what they had done. She testified: "He [Logan] said that they went into the gun store and there were two men there, and that they each had shot one person in the head, and one of the mens [sic] was wounded in the side and that he knelt down and shot him in the head." (Tr. at 288.) Cole Hardaway testified that approximately two hours later they all left for Chicago. We note that at the time of her testimony, Cole Hardaway's husband had pled guilty to the gun-trafficking charges, but had not yet been sentenced. (Tr. at 1118-19.)

Additional evidence showed that when he was picked up in Chicago still in the company of Roan and Hardaway, Logan had a loaded semi-automatic pistol stolen from Lloyd's in his waistband. (Tr. at 1281-82.)

Logan's version of events is that he had no knowledge that Roan intended to commit the robbery. He maintains that he was surprised by the shootings, that he did not shoot either of the clerks, and that after the shootings he acted under coercion or duress in carrying the guns out of the store and then transporting them to Chicago. At the time the robbery took place, Logan had just turned twenty years old and had moved to Mankato approximately a year earlier. (Tr. at 1685.) Prior to moving to Mankato, Logan had completed one year of college at William Penn in Oskaloosa, Iowa. (Tr. at 1683.) He moved to Mankato after that year to be with his girlfriend and attend Mankato State University, but he never enrolled, intending to wait a year so as not to lose a year of athletic eligibility. (Tr. at 1685-86.) Logan stated that he met Hardaway soon after moving to Mankato through his job as a security guard, (Tr. at 1687-88.), and met Roan through mutual friends in approximately January. (Tr. 1708-09.) Roan was several years older than Logan, and was identified by Hardaway as a member of the Chicago street gang Four Corner Hustlers. (PSR 6.) Hardaway described Logan as "Zack's [Roan's] guy." (PSR 6.) Prior to this crime, Logan had a criminal history score of zero. (PSR 12.)

-25-

Logan testified at trial that the morning of the robbery he had been target shooting with some friends, including Roan, and that Roan had given him a semi-automatic pistol to shoot with which he [Logan] kept in his coat after they left the field. (Tr. at 1731.) Logan stated that he had been taught to shoot by his father, taken shooting at a young age, and that he had been out target shooting approximately four or five times while living in Mankato, but did not own his own gun. (Tr. at 1715.) According to Logan, that day after they finished target shooting Roan asked him for a ride to Lloyd's Gun Shop. (Tr. 1736.) Logan stated that he initially refused, but relented after Roan later asked him again several times. (Tr. 1736-38.) Logan testified that he was aware of the fact that Roan often purchased guns. (Tr. at 1694, 1813.) At trial, Logan testified to a version of the events at Lloyd's substantially similar to the version he had given to police in Chicago:

> So I'd say about within the next five to six minutes Zach pulled his gun out and shot the other guy. And then he ran over to where I was at and I was just like sitting with my hands in my pockets, and he shot the other guy about two, I think two or three times . . . . I was, like, I thought you was going to buy the gun. And he's like, fuck this, fuck that, just grab the rifles, grab the rifles. And so I went around–before that, I had went to the guy that he had shot first and I did like this (indicating) and the guy was dead. And I grabbed, I think, two or three rifles and I sat them down in front of the door. And before that I had sat my pistols up on top of the glass counter, you know. And then while I was taking the guy's pulse, you know, I heard another shot, you know, and I looked back and Zach was grabbing these boxes and stuff. And my gun was lying on the floor, so I went and grabbed it, put it in my pocket.

(App. at 76.)

Logan testified that after he picked up his gun he told Roan, "I can't stand this," and went out to the car. (Tr. at 1763.) Roan followed him, pointed a gun at him while he was seated in the car, and told him to get back inside and help with the rifles, which

-26-

he did out of fear of death. (Tr. at 1764.) On the way back to Mankato, Roan warned him, "Don't be the weak link in the chain." (Tr. at 1774.)

In light of this conflicting evidence and the fact that Logan was acquitted by a state court jury for essentially the same crime, we cannot say the admission of Roan's statement that "another individual" had planned and participated in the robbery with him was harmless beyond a reasonable doubt. Accordingly, Logan is entitled to a new trial on the charges of robbery[8] and use of a firearm in a crime of violence.[9] We affirm Logan's convictions for conspiracy,[10] unlicenced firearms dealing,[11] and transportation and receipt of stolen firearms,[12] and remand for resentencing on these convictions.

## Conclusion

We have carefully considered all of the arguments presented by the defendants, and for the foregoing reasons affirm in part and reverse in part and remand to the district court for proceedings not inconsistent with this opinion.

---

[8]Count 2: Robbery Affecting Interstate commerce, in violation of 18 U.S.C. § 1951.

[9]Count 3: Use and Carrying a Firearm in a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1) and 2.

[10]Count 1: Conspiracy, in violation of 18 U.S.C. § 371.

[11]Count 33: Unlicenced Dealing in Firearms, in violation of 18 U.S.C. §§ 922(a)(1)(A), 924(a)(1)(D) and 2.

[12]Count 34: Transportation and Receipt of Stolen Firearms, in violation of 18 U.S.C. §§ 922(j), 924(a)(2), and 2.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.